KENNECOTT CORPORATION and KC Development Inc., Plaintiffs-Appellants,

v.

SMITH, James, Chief of the Bureau of Securities in the Division of Consumer Affairs in the Department of Law and Public Safety of the State of New Jersey; John J. Degnan, Attorney General of the State of New Jersey; and Curtiss-Wright Corporation, Defendants-Appellees.

No. 80–2696.

United States Court of Appeals, Third Circuit.

Argued Dec. 11, 1980.

Decided Dec. 17, 1980.

John T. Dolan, Crummy, Del Deo, Dolan & Purcell, Newark, N. J., for defendant-appellee Curtiss-Wright Corp.; Robert B. Mazur (Argued), Wachtell, Lipton, Rosen & Katz, New York City, of counsel.

Ronald S. Blumstein (Argued), Deputy Atty. Gen. of the State of New Jersey, Newark, N. J., for defendants-appellees Smith and Degnan.

Charles H. Hoens, Jr., Lum, Biunno & Tompkins, Newark, N. J., Richard J. Urowsky (Argued), Sullivan & Cromwell, New York City, for plaintiffs-appellants, Kennecott Corp. and KC Development.

Before ADAMS, GARTH and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal from a denial of a motion for a preliminary injunction in a hotly contested tender offer battle presents the important question whether the New Jersey takeover law is preempted by the Williams Act, 15 U.S.C. § 78m(d)–(e), 78n(d)–(f), and SEC Rule 14d–2(b) promulgated thereunder. The issue of federal court deference to state proceedings under the doctrines of *Pullman* and *Younger* abstention is also a factor in this appeal. We hold that we are not precluded by these abstention doctrines from granting relief, and that the district court erred in evaluating the plaintiff's likelihood of success and irreparable injury. We therefore reverse the denial of preliminary injunctive relief, and remand for further proceedings.

## I. Statement of the Case

The proceedings prefacing this appeal are manifold as well as complicated. On November 21, 1980, the Board of Directors of Kennecott Corporation voted to make a cash tender offer for up to 4,100,000 shares of the common stock of Curtiss-Wright Corporation at $40 per share. Kennecott issued a press release on the same day announcing the Board's decision, specifically disclosing the number of shares of Curtiss-Wright common stock it proposed to purchase and the price it would offer.

As a result of publicly announcing its offer, Kennecott was required under federal law to "commence" or withdraw the tender offer within five business days of the announcement—no later than November 28. SEC Rule 14d–2(b), 17 C.F.R. § 240.14d–2(b). Under the New Jersey Corporation Takeover Bid Disclosure Law, N.J. Stat.Ann. §§ 49:5–1 *et seq.*, which applies to this tender offer because the principal executive offices of Curtiss-Wright are in New Jersey, Kennecott is prohibited from commencing its offer until at least twenty days after the announcement. N.J.Stat.Ann. § 49:5–3. There may also be further delay, because appellee James Smith, the Chief of the New Jersey Bureau of Securities, has decided to hold a hearing on the proposed offer. Thus, Kennecott claims that, from the time it announced the tender offer, it was not possible to comply with the commencement provisions of both federal and state law.

The commencement of the offer is the time at which an offeror is required to disseminate to shareholders the material information regarding the offer that the federal securities laws require. An offeror must file a disclosure statement on schedule 14D–1 with the Securities and Exchange Commission ("SEC"), and must take certain additional steps to effect actual receipt by the shareholders of material information relating to the offer, the companies involved in the offer, and the terms of the offer.

The federal policy underlying these requirements is to insure the prompt dissemination of all material information after the first public announcement. The information is necessary because the announcement of the offer itself will precipitate significant market activity in the securities of the target company, thus confronting public investors with an immediate need to make investment decisions. *See* SEC Release No. 34–16384, 44 Fed.Reg. 70326, 70329 n.15 (1979).

To protect its right to proceed under the Williams Act, which must be presumed valid,[1] and to prevent the application of a conflicting state law to its proposed tender offer, Kennecott filed an action in federal district court on November 21, the date of its announcement, seeking (1) a declaratory judgment that the New Jersey Takeover Law is unconstitutional as applied to Kennecott's tender offer for shares of Curtiss-Wright, because it conflicts with and is preempted by the federal law, and (2) preliminary and permanent injunctive relief restraining enforcement of the New Jersey Takeover Law against the Kennecott offer.

At the time it filed its complaint, Kennecott also obtained a temporary restraining order prohibiting the defendants from commencing other litigation bearing on the constitutional validity of the New Jersey law. Such an order was sought to avoid a multiplicity of lawsuits and to prevent delay beyond the five day requirement of Rule 14d–2(b).

On November 25, the district court denied Kennecott's motion for a preliminary injunction and vacated the existing temporary restraining order, concluding that Kennecott had failed to meet its burden of showing a probability of success on the merits or irreparable harm if the injunction were not granted. The court did not consider delay to be irreparable injury. On the merits, the court indicated that Kennecott might have been able to avoid the conflict if it had omitted from its announcement the number of shares it sought to purchase and the price it was prepared to pay for such

shares. N.J.Admin.Code 13:47A–25.3(b). This omission, it is argued, would have placed Kennecott within a so-called "safe harbor." 17 C.F.R. § 240.14d–2(d). In addition, the court viewed denial of Kennecott's motion as a means of preserving the *status quo* until trial. The court also asserted that the denial of relief was supported by the doctrine of abstention and related equitable principles emanating from *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Kennecott immediately filed a notice of appeal and a motion for a stay or injunction pending appeal.

After the district court decision, the defendants took steps to effectuate the New Jersey law. Smith, in his capacity as the Chief of the New Jersey Bureau of Securities issued a cease and desist order on November 26 that directed Kennecott not to commence the tender offer before the expiration of the twenty-day waiting period. To preserve its ability to comply with federal law and commence its offer, Kennecott also filed a notice of appeal from that order with the Appellate Division of the Superior Court of New Jersey. The effect of the appeal was to stay Smith's order, at least until further proceedings in the Appellate Division.

Thus, Kennecott was not under any restraint against commencement of the tender offer on November 28, the last date for commencing the offer authorized by federal law. Kennecott instituted the offer on that date by publishing a summary advertisement in the national financial press and by filing with the SEC a disclosure statement on Schedule 14D–1. Kennecott also took steps to comply with the dissemination requirements of federal law. Pursuant to SEC Rule 14d–5, 17 C.F.R. § 240.-14d–5, it asked Curtiss-Wright either to provide a shareholder list or to agree to mail Kennecott's Offer to Purchase—containing required disclosures relating to the

---

1. In none of the opinions regarding various aspects of the Williams Act has it been suggested that the Act or the regulations issued pursuant to it are not valid.

offer—to Curtiss-Wright shareholders. Curtiss-Wright elected the second option, but has not distributed copies of Kennecott's offer to purchase, because of subsequent state court developments.

On December 1, Smith applied to the Appellate Division for an order vacating the stay effected by Kennecott's appeal from his November 26 order, and enjoining Kennecott from engaging in any acts in furtherance of the tender offer. The Presiding Judge of the Appellate Division granted the motion for temporary relief. A panel of the Appellate Division held a hearing on December 9, and continued the restraints against Kennecott by enforcing the cease and desist order. The panel did not entertain Kennecott's appeal from that order on that day, and specifically declined to consider at that time whether the New Jersey Act or pertinent parts of the New Jersey Act were preempted by the federal act and regulations.

The same day that Smith applied to the Appellate Division, December 1, Curtiss-Wright commenced an action in the Superior Court of New Jersey, Chancery Division, seeking injunctive relief against the tender offer and the voting of any shares Kennecott acquires. Curtiss-Wright's complaint relies on the sections of the New Jersey Takeover Law that delay commencement of a tender offer; it has not yet brought on a motion for a preliminary injunction.

Also on December 1, Curtiss-Wright formally requested that Smith hold a hearing on Kennecott's offer. On December 11, Smith announced, in a written opinion, that he would hold a hearing to determine whether Kennecott's alleged plans for material changes in the Curtiss-Wright corporate structure would be in the public interest, would be fair to security holders, or would affect employee pension plans. During the pendency of this proceeding Kennecott may not proceed with its tender offer, even though the twenty day waiting period of the New Jersey Takeover Law, N.J.Stat. Ann. § 49:5–3 has expired.

On December 2, this Court heard argument on Kennecott's motion for an injunction pending appeal or stay pending appeal. By order entered December 3, 1980, we denied the motion "without prejudice to the merits of appellants' basic claim." Because of the short time requirements for tender offers established by the SEC regulations, we expedited the appeal and heard argument on the merits of the district court's denial of preliminary injunctive relief on December 11.

## II. Abstention and Equitable Restraint

### A. Pullman Abstention

■ The district court indicated, and appellee Curtiss-Wright contends, that the federal court should abstain from reaching the merits of the claim for preliminary injunctive relief under the doctrine of *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In view of the rationale for *Pullman* abstention, however, we do not believe that this is an appropriate case for deferring to a state court. The *Pullman* doctrine is derived from the policy that whenever possible the judiciary should resolve a matter on state law grounds if such bases for decision would obviate the need to reach a federal constitutional question. *Cf. Hagans v. Lavine*, 415 U.S. 528, 545–50, 94 S.Ct. 1372, 1383, 39 L.Ed.2d 577 (1974); *Siler v. Louisville & Nashville R. R. Co.*, 213 U.S. 175, 193, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909); *Rath Packing Co. v. Becker*, 530 F.2d 1295, 1307 (9th Cir. 1975), *aff'd sub. nom. Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). When it is necessary to resort to construction of an ambiguous or unsettled state provision to determine whether state law will enable a court to avoid a constitutional issue, *Pullman* admonishes federal courts to abstain from resolving the state question. In such circumstances the state courts should be given the opportunity to construe their own laws. See *D'Iorio v. County of Delaware*, 592 F.2d 681, 686 (3d Cir. 1978). The type of state question that usually triggers *Pullman* abstention is presented when "the unsettled issue of state law principally concern[s] the *applicability of the challenged*

*[state] statute to a certain person or a defined course of conduct,* whose resolution in a particular matter would eliminate the constitutional issue and terminate the litigation." *Baggett v. Bullitt,* 377 U.S. 360, 376–77, 84 S.Ct. 1316, 1325, 12 L.Ed.2d 377 (1964) (emphasis added).

The case at hand involves no such unsettled question of state law. It is undisputed that the challenged New Jersey provisions apply to Kennecott's takeover bid. Moreover, the New Jersey statute is clear on its face, and it is not susceptible of being construed in a way that would render it unnecessary to examine its impact on the purposes of the federal Williams Act.[2] In a preemption case, once it is evident that both a federal and a state law apply to a given situation, resolution of the case turns on an analysis of the policies of federal law. As the Supreme Court has made clear, the preemption doctrine involves more than a comparison of the letter of each law. It requires determination whether the state's "law stands as an obstacle to the accomplishment and execution of the *full purposes and objectives* of Congress." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525–26, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1940) (emphasis added).[3]

It would be inconsistent with our paramount duty to interpret and protect federal policies to invoke *Pullman* abstention in this preemption case. As the Supreme Court has recognized in the analogous context of pendent jurisdiction, supremacy clause claims are "essentially one[s] of federal policy," so that "the federal courts are particularly appropriate bodies for the application of preemption principles." *Hagans v. Lavine,* 415 U.S. 528, 550, 94 S.Ct. 1372, 1385, 39 L.Ed.2d 577 (1974); *United Mine Workers v. Gibbs,* 383 U.S. 715, 729, 86 S.Ct. 1130, 1140, 16 L.Ed.2d 218 (1966).

Curtiss-Wright suggests, however, that the recent decision by the Seventh Circuit to abstain in a securities case presenting a claim of preemption indicates that we, too, should defer to the state courts. In *City Investing Co. v. Simcox,* 633 F.2d 56 [current] Fed.Sec.L.Rep. (CCH) ¶ 97,661 (7th Cir., Oct. 17, 1980), the plaintiffs sought to have a certain provision of the Indiana takeover law declared invalid under the Williams Act, the Supremacy Clause, and the Commerce Clause. *Simcox* involved open market purchases rather than a tender offer, so it was uncertain whether the state law even applied to plaintiff's conduct. If the state law was found to be inapplicable, there would be no conflict with federal law, and the preemption and supremacy clause issues would be obviated. *Simcox* therefore presented a classic situation for *Pullman* abstention, see *Baggett v. Bullitt, supra,* and the federal court properly chose to defer to Indiana courts to enable them to decide whether the state law applied. *Simcox* is clearly distinguishable from this case, because here the applicability of the New Jersey statute is clear, compelling the federal court to examine the constitutional issues.

B. *Younger v. Harris* Abstention

▉ The district court also indicated reluctance to grant the preliminary relief requested by Kennecott in light of the abstention doctrine enunciated in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Under the *Younger* doctrine, a federal court should not enjoin pending state proceedings, or state proceedings commenced after the filing of the federal action but prior to "proceedings of substance on the merits" in the federal suit. *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45

2. Defendants contend essentially that the New Jersey Takeover Law would operate so as to avoid a conflict with the SEC regulations. Our discussion of this issue appears at p. 188 *infra.*

3. Thus, even if, as Curtiss-Wright argues, Kennecott technically might have been able to com-

ply with both laws, we would still have to ascertain whether invocation of the New Jersey law to force Kennecott to follow a course other than one they are entitled to pursue under the Williams Act would undercut the federal policy of prompt and full disclosure to shareholders.

L.Ed.2d 223 (1975). At the time the district court entertained the merits of Kennecott's motion for a preliminary injunction, there were no extant state proceedings in any form. Thus, there were no *Younger* considerations involved in the case. Therefore, when the district court reasoned that "were it not for the institution of this [federal] action, state proceedings undoubtedly would have been instituted," the court incorrectly made reference to the *Younger* doctrine. (Transcript of bench opinion, reprinted in Appendix to Brief of Plaintiffs-Appellant at A34–35 [hereinafter referred to as App. ]). Where, as here, the district court considered affidavits and briefs, heard extensive oral arguments, and analyzed and ruled on the merits of a motion for preliminary injunctive relief, *Younger* does not compel the federal courts to stay their hands. *Cf. Morial v. Judiciary Comm'n*, 565 F.2d 295 (5th Cir. 1977) (en banc); *Housworth v. Glisson*, 485 F.Supp. 29 (N.D.Ga.1978); *Graham v. Breier*, 418 F.Supp. 73 (E.D.Wis.1976).[4] Although state proceedings have now been brought, this Court is reviewing the question whether the district court should have granted relief on November 25, before any state proceedings were in any way initiated. Because *Younger* was not a viable issue before the district court, we may fulfill our appellate review function free of the constraints of the abstention doctrine. Our attention has not been called to any authority holding that the *Younger* principle is meant to deprive a litigant who received a ruling from the federal court before any state proceedings began, of the right to appeal.

## C. Anti-Injunction Act

■ The third contention advanced by the defendants to suggest that this Court is precluded from granting the relief sought by Kennecott is the anti-injunction statute, 28 U.S.C. § 2283. It provides:

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

This statute is inapplicable here for several reasons. First, actions brought under § 1983, such as this case, are explicit exceptions to the anti-injunction act. *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).[5] Moreover, in *Mitchum* the Supreme Court repeatedly referred to § 2283 as barring only the issuance of a federal injunction against *pending* state proceedings. 407 U.S. at 226, 228–31, 92 S.Ct. at 2154. *See also Dombrowski v. Pfister*, 380 U.S. 479, 484 n.2, 85 S.Ct. 1116, 1119 n.2, 14 L.Ed.2d 22 (1965); *Barancik v. Investors Funding Corp.*, 489 F.2d 933 (7th Cir. 1973); *Moore's Federal Practice* ¶ 0.229[1]. As we previously emphasized in the discussion of the *Younger* doctrine, no state proceedings were pending at the time the district court ruled on the motion for injunctive relief.[6] A grant of the request would have enjoined the commencement of actions to enforce the New Jersey law, but it would not have involved enjoining any state proceedings already underway. Section 2283, the Supreme Court has explained, does "not preclude injunctions against the institution of state proceedings, but only

---

4. *Younger* does not apply to the state lawsuit filed in the Chancery Division on December 1, 1980 by Curtiss-Wright. In *Johnson v. Kelly*, 583 F.2d 1242 (3d Cir. 1978), this Court established that the *Younger* doctrine applies only to proceedings initiated by the state itself.

5. The present action is properly brought under § 1983 because it seeks redress for deprivations of constitutional rights secured by the commerce clause and of federal statutory rights protected by the Williams Act. *See Maine v. Thiboutot*, —— U.S. ——, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

6. This case is therefore distinguishable from *Roth v. Bank of the Commonwealth*, 583 F.2d 527 (6th Cir. 1978), *cert. denied*, 442 U.S. 925, 100 S.Ct. 2852, 61 L.Ed.2d 292 (1979), upon which appellees rely. *Roth* rejected the reasoning of *Barancik*, supra, and applied § 2283 to state proceedings commenced after the federal complaint was filed. The state suits were instituted *before* the federal court was called on to issue injunctive relief, however, so that at the time it considered the injunction motion the district court was faced with *pending* state proceedings.

bars stays of suits already instituted." *Dombrowski v. Pfister, supra,* 380 U.S. at 484 n.2, 85 S.Ct. at 1119 n.2.

On this appeal we must decide whether the district court should have granted injunctive relief on November 25. We are not foreclosed from reversing the district court simply because the federal defendants raced to the state courts after the federal court acted. The anti-injunction act is not designed to deprive a federal plaintiff of the right to an appeal. Indeed, the statute expressly contemplates enjoining pending state proceedings when necessary in aid of the jurisdiction of the federal court. In this instance, we must preserve our appellate jurisdiction and review function. Since there were no state proceedings to be enjoined at the time the district court acted, the anti-injunction statute does not foreclose relief.

Accordingly, we conclude that there are no barriers to consideration of the merits of appellant's request for a preliminary injunction.

## III. Request for a Preliminary Injunction

■ Although the scope of appellate review of the action of a district court in entertaining a motion for preliminary injunctive relief is narrow, reversal is warranted if the trial court abuses its discretion or commits error in applying the law. *Continental Group, Inc. v. Amoco Chem. Corp.,* 614 F.2d 351, 357 (3d Cir. 1980); *A. O. Smith Corp. v. FTC,* 530 F.2d 515, 525 (3d Cir. 1976).

To obtain a preliminary injunction, the moving party must show (1) a reasonable probability of eventual success in the litigation, and (2) that irreparable injury will ensue if relief is not granted. In addition, the court may consider (3) the possibility of harm to other interested persons from the grant or denial of relief, and (4) the public interest. *Constructors Ass'n of Western Penna. v. Kreps,* 573 F.2d 811, 815 (3d Cir. 1978); *Delaware River Port Auth. v. Transamerica Trailer Transp., Inc.,* 501 F.2d 917, 919–20 (3d Cir. 1974).

### A. Probability of Success

■ Kennecott has demonstrated a reasonable likelihood of eventual success on the merits. Several courts of appeals have already found provisions in state takeover laws virtually identical to the one challenged here to be preempted by the Williams Act. *See MITE Corp. v. Dixon,* 633 F.2d 486 [current] Fed.Sec.L.Rep. (CCH) ¶ 97,660 (7th Cir. 1980); *Great Western United Corp. v. Kidwell,* 577 F.2d 1256 (5th Cir. 1978), rev'd on venue grounds sub. nom. *Leroy v. Great Western United Corp.,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979); *Hi-Shear Indus. v. Campbell,* C.A.No. 80–2211–9, (D.S.C., Dec. 4, 1980), stay pending appeal denied, Nos. 80–1825, 80–1826 (4th Cir., Dec. 8, 1980).[7] Kennecott has shown that it pursued a course authorized under federal law, that this course conflicted with state law, and that it was not possible to comply with both schemes. It has also demonstrated that the effect of the state law has been to prevent prompt disclosure of crucial information to the shareholders, and, through delay, to shift the advantage in this struggle to incumbent management. Both these effects appear to be inimical to the purposes of the federal law. A primary purpose of the Williams Act, as well as the regulations adopted under it[8] is to ensure that full information is

---

**7.** This opinion, decided December 4, was not available to the district court when it denied the preliminary injunction.

**8.** Appellee Smith contends that the SEC regulation at issue here, Rule 14d–2(b), 17 C.F.R. § 240.14d–2(b), is invalid because it intrudes on the state regulatory scheme. He points to the legislative history of the Williams Act and 15 U.S.C. § 78bb(a), which indicate that the federal law was not intended completely to remove the role of state securities commissions in the tender offer area. Section 78bb(a) plainly states, however, that states may act only insofar as they do "not conflict with the provisions of this chapter *or the rules and regulations thereunder.*" (emphasis added). We are required, therefore, to give effect to the presumptively valid regulations of the SEC, which appear consistent with the prompt disclosure policy of the Williams Act, over contradictory state regulations.

conveyed to the shareholders of a target company as soon as possible, so that they may exercise a knowledgeable and an unfettered choice. The Act is also designed to preserve a balance between incumbent management and challenging groups, so that neither has an undue advantage. *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). *MITE, supra*; *Kidwell, supra*; S.Rep.No. 550, 90th Cong., 1st Sess. 3 (1967); 113 Cong. Rec. 854 (1967) (statement of Senator Williams).

Defendants argue that Kennecott has not shown a reasonable probability of success because it could have complied with both laws if it had utilized the "safe harbor" provision of the New Jersey rules by not announcing the price and number of shares sought. N.J.Admin. Code 13:47A–25.3(b). Under federal law, a public announcement that does not contain this information does not trigger the five-day "commence or withdraw" period. SEC Rule 14d–2(d), 17 C.F.R. § 240.14d–2(d). This SEC rule, however, envisions that the price and amount information will not reach the market by any indirect route. While an offeror could issue a public announcement limited in this manner under New Jersey law, the offeror must still furnish price and amount information to the management of the target corporation. The target company in turn may be obliged to disseminate this information to its shareholders and to the securities markets in general under federal law, the rules of the New York Stock Exchange, and state law. N.J.Stat. Ann. § 49:5–3a; NYSE Company Manual at A–18; SEC Release No. 34–16623, 45 Fed.Reg. 15521 (1980). Taken as a whole, therefore, it appears that the filing requirements of New Jersey law result in disclosure to the market by means inconsistent with those contemplated by the "safe harbor" provision of the federal regulations.

Thus, the "safe harbor" provision does not obviate the constitutional problem posed here. The issue in this preemption case is whether the impact of the New Jersey law on the course actually pursued by Kennecott—an action it was entitled to take under federal law—conflicted with the Williams Act and SEC regulations. Preemption analysis focuses on whether the state law serves as an obstacle to the operation of federal law "in the circumstances of this particular case," rather than in all cases or in a hypothetical case. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525–26, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Moreover, even if employing the "safe harbor provision" might have reconciled the facial conflict presented here, that would not dissipate Kennecott's reasonable probability of success on the merits. A court would still have to examine the effect of the state scheme on the objectives of the federal law. It appears here that even if Kennecott had chosen a course other than the one they were authorized to take under federal law, the delay in full disclosure engendered by even the safe harbor provision might well undermine the Williams Act policies discussed above.

## B. Irreparable Injury

Analysis of the merits and the question of irreparable injury are closely linked in the situation presented by the appeal at hand. The irreparable injury that Kennecott will suffer if it cannot proceed with its tender offer under federal law is precisely the harm sought to be avoided by the Williams Act. Kennecott has demonstrated that delay in distributing the information beyond the time frame of the SEC regulations is occurring, and that this delay is negating any possibility that Kennecott or the Curtiss-Wright shareholders will ever again be in the position they have a right to be in by virtue of federal law. Under the structure of the Williams Act and the SEC regulations, this delay in and of itself constitutes irreparable injury. *See MITE, supra*, at 495–499; *Kidwell, supra*, at 1279–80.

The other courts of appeals that have considered the conflict between state takeover laws and the Williams Act have discussed at considerable length the detrimental effects of delay. See *MITE, supra*, 486 F.2d at 495–499; *Kidwell, supra*, at 1279–90: See also *Hi-Shear, supra*, slip op. at

9–11. These courts have ascertained that Congress itself has determined that delay is the most potent weapon for incumbent management. See, e. g., *MITE, supra,* and sources cited therein. The "market approach" for protecting investors established by the Williams Act contemplates the free flow of information from both sides, so that the shareholders can make an unfettered and knowledgeable choice whether to relinquish their shares for a cash premium. When commencement of the offer, which entails distribution of information, is delayed, the market approach cannot be effectuated, because the choice can no longer be an informed one. While the shareholders have yet to receive the benefit of full knowledge of the merits and terms of the challenger's offer, the target's management can use the period of delay to send materials to the shareholders in order to discourage them from tendering their stock. This is the course apparently pursued by Curtiss-Wright. During the period of delay the management may also resort to defensive maneuvers designed to deprive the shareholders of their free choice. Common defensive tactics include arranging a "friendly" merger, increasing dividends, or abolishing cumulative voting.[9] While being subjected to these actions, which are designed to influence their decision, the shareholders cannot enjoy their federally protected right to be informed, or their right to make a choice about the governance of their corporation and the disposition of their shares.

Delay may also have detrimental effects on the stock market. When announcement of a tender offer is not followed promptly by commencement of the offer, the likely instigation of market activity during the waiting period may drive up the price of the target's stock. Shareholders who are not fully apprised of the offer's terms cannot evaluate whether to sell on the escalating market or to wait and tender their stock for a higher cash premium.

The offeror suffers from delay as well. Delay augments the possibility that the offer will not be completed successfully—not through adverse action of the shareholders, as Congress contemplates, but through barriers erected by the target management. See *MITE, supra,* at 497. Moreover, delay deprives the offeror of its right to appeal to the stockholders by divulging the terms of its offer. Delay also causes the offeror to incur substantial financial costs which are not recoverable. When the offeror has borrowed funds to support the offer, it must make interest payments for each day that the offer is extended. See *Hi-Shear, supra,*

---

**9.** See *MITE, supra,* at 497 and n.22. As the Fifth and Seventh Circuits recognized, the assessment of Congress that delay is inimical to the neutrality and shareholder free-choice protected by the Williams Act was reaffirmed when Congress considered the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a.

The House Report stated that
it is clear that this short waiting period [referring to the 10 days required by the Williams Act] was founded on congressional concern that a longer delay might unduly favor the target firm's incumbent management and permit them to frustrate many procompetitive cash tenders. This 10-day waiting period thus underscores the basic purpose of the Williams Act—to maintain a neutral policy toward cash tender offers, by avoiding lengthy delay that might discourage their chances for success.·

H.R.Rep.No. 94–1373, 94th Cong. 2nd Sess. 12 (1976); U.S.Code Cong. & Admin.News 1976, pp. 2572, 2644. Congressman Rodino explained to the House:

Lengthy delays will give the target firm plenty of time to defeat the offer, by abolishing cumulative voting, arranging a speedy defensive merger, quickly incorporating in a State with an antitakeover statute, or negotiating costly lifetime employment contracts for incumbent management. And the longer the waiting period, the more the target's stock may be bid up in the market, making the offer more costly—and less successful. Should this happen, it will mean that shareholders of the target firm will be effectively deprived of the choice that cash tender offers give to them. . . . *Generally, the courts have construed the Williams Act so as to maintain these two options for the target company's shareholders, and the House conferees contemplate that the courts will continue to do so.*
122 Cong.Rec. 20877 (1976) (emphasis added [by the Fifth Circuit]).
*Kidwell, supra,* at 1277–78; *MITE, supra,* at 498.

at 11. The offeror may also have to forego its right to earn interest on the money that it must hold in reserve, because were it not for the outstanding offer these funds could be invested at the current high interest rates.

In essence, the cumulative impact of the effects flowing from delaying commencement of the offer is to "disrupt the neutrality essential to the execution and the proper operation of the market approach for protecting investors embraced by the Williams Act." *Hi-Shear, supra,* at 11; *MITE, supra,* at 495; *Kidwell, supra,* at 1279–90. The district court thus appears to have misjudged the thrust of the Williams Act by concluding that no irreparable harm had been proved because "the only harm which may result to the plaintiffs is that harm which is incident to delay." (App. at A32). But this is precisely the harm that federal policy does not tolerate.

Curtiss-Wright contends that a court cannot ascertain whether irreparable injury will occur without holding a protracted evidentiary hearing. In this instance, however, a hearing is not necessary, because the Williams Act itself furnishes the basis for a finding of irreparable harm. A traditional testimonial record is not necessary here since Congress has already established the record—after extensive hearings Congress determined that delay is detrimental to the interests of the investing public. We are not free to challenge this legislative judgment. See *MITE, supra,* at 498. *Cf. Dennis v. U. S.,* 341 U.S. 494, 532–42, 71 S.Ct. 857, 879, 95 L.Ed. 1137 (1951) (Frankfurter,

J., concurring). Thus, even if defendants were to offer witnesses who would express the view that the tender offer might be able to go forward once the New Jersey proceedings have been concluded, the shareholders would still have been deprived of crucial information and the right at an early opportunity to weigh both sides. Kennecott would still have been denied its right to proceed under the timetable established by federal law. In addition, it would not be possible to recast the balance between incumbent and challenger, because while the New Jersey law is being employed to restrain Kennecott from sending information to Curtiss-Wright shareholders,[10] Curtiss-Wright is campaigning with its stockholders to defeat the offer whose terms the shareholders have not yet been apprised of. We therefore agree with the courts in *MITE* and *Hi-Shear,* which did not consider testimony as part of the calculus required to reach their decisions, that irreparable injury may be established by the invocation of the Williams Act itself. The affidavits presented in this case are therefore sufficient basis for decision.

As for the public interest factor, Congress has declared what procedure is most salutory in tender offer situations. We are obligated to observe the congressional policy choice. Federal policy also guides our analysis of the final element—the weighing of the respective harms. In the view of Congress, shareholders will be disadvantaged by delayed disclosure. Although it may be counter to the interest, in a sense, of the target company, or at least its incum-

10. Because the New Jersey scheme has operated in this case to prevent Kennecott from disseminating information that it is entitled under federal statutes and regulations to convey, it may also be difficult to reconcile the effect of the New Jersey provisions with the recently expanded scope of First Amendment protection for commercial speech. See *Central Hudson Gas & Electric Co. v. Public Service Comm'n.,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The thrust of the commercial speech doctrine is that if purchasers, or in this case the target shareholders, have full information on the pur-

chase terms and implications, "the rational decisionmaking that fosters self-government in the economic sphere" will be facilitated. The Supreme Court—1979 Term, 94 Harv.L.Rev. 75, 165 (1980). Thus, the recent Supreme Court cases indicate that "[t]he state cannot control commercial speech as an incident to its control over the economic operations of a corporation. Economic regulation is presumptively valid because it arises from and is subject to correction by an unfettered political process. Because it restricts the flow of information by which the public becomes aware of, and acts to change, legislation, regulation of expression cannot be similarly justified." *Id.* at 167.

bent management, if the tender offer comes to fruition consistent with federal law, this is not the type of "harm" that Curtiss-Wright is entitled to be shielded from under the Williams Act.

For the foregoing reasons, we conclude that Kennecott established that preliminary injunctive relief is necessary in this case. The district court erred by improperly evaluating Kennecott's likelihood of success on the merits and by incorrectly assessing the factor of irreparable injury. Accordingly, the order of the district court will be reversed, so that Kennecott may "commence" its tender offer pursuant to the Williams Act and the applicable SEC regulations by having information disseminated to the shareholders of Curtiss-Wright.

Our decision here, in the context of a preliminary injunction motion, is a limited one. We have held no more than that the New Jersey provisions delaying "commencement" of a tender offer beyond the five-day period conflict with the SEC regulations promulgated under the Williams Act. To that extent, we have concluded that there is a reasonable likelihood that Kennecott will prevail in its contention that the Williams Act and the regulations preempt New Jersey's takeover rule. We do not reach or decide the severability issues or the validity of other provisions of the New Jersey takeover statute. These matters are for the district court in the first instance.

The matter will be remanded to the district court for proceedings on the merits of the constitutional issues presented by the complaint for permanent injunctive and declaratory relief.[11]

The mandate shall issue forthwith.

---

11. Because time is of the essence in this litigation, it is urged that such proceedings should be conducted as expeditiously as possible.