**JOSEPH E. SEAGRAM & SONS, INC. and Jes Holdings, Inc., Plaintiffs,**

v.

**CONOCO, INC., a Delaware Corporation, Defendant.**

Civ. A. No. 81–276.

United States District Court, D. Delaware.

July 21, 1981.

As Amended July 23, 1981.

R. Franklin Balotti, Allen M. Terrell, Jr., Jesse A. Finkelstein and Samuel A. Nolen of Richards, Layton & Finger, Wilmington, Del., Simpson, Thacher & Bartlett, New York City, of counsel, for plaintiffs Joseph E. Seagram & Sons, Inc., and Jes Holdings, Inc.

Bruce M. Stargatt, Jack B. Jacobs and Richard A. Levine of Young, Conaway, Stargatt & Taylor, Wilmington, Del., Dewey, Ballantine, Bushby, Palmer & Wood, New York City, of counsel, for defendant Conoco, Inc.

## MEMORANDUM OPINION

LATCHUM, Chief Judge.

Plaintiffs, Joseph E. Seagram & Sons, Inc. ("Seagram"), and its wholly-owned subsidiary, JES Holdings, Inc. ("JES"), are engaged in a hostile tender offer to acquire a controlling interest in defendant, Conoco, Inc. ("Conoco"). On June 25, 1981, the date on which the material terms of the offer were publicly announced, plaintiffs brought this action, seeking a declaratory judgment: (1) that the provisions of the Delaware Takeover Statute 8 *Del.C.* § 203, are unconstitutional; (2) that a recently enacted amendment to Conoco's bylaws which purports to place restrictions on the transfer of Conoco stock to a designated class of "aliens," including plaintiffs, is invalid under Delaware law; and (3) that a proposed amendment to Conoco's certificate of incorporation containing parallel restraints on stock transferability and additional restrictions on the ownership rights of "aliens" similarly violates Delaware law. (Docket Item ["D.I."] 1.) Plaintiffs' complaint, as filed, further sought to enjoin Conoco and the Attorney General of the State of Delaware from taking any action to enforce the Takeover Statute against plaintiffs and to enjoin Conoco from acting to implement and enforce the bylaw and proposed charter amendment. (*Id.*)

On the same day this suit was filed, the Court issued an order temporarily restraining Conoco and the Attorney General of the State of Delaware from invoking the provisions of the Delaware Takeover Statute to delay the commencement of plaintiffs' tender offer. (D.I. 6.)[1] Thereafter, the parties entered into a stipulation, dated June 30, 1981, and approved by the Court, under which Conoco agreed not to seek enforcement of the Takeover Statute, thus eliminating that issue from the case. (D.I. 15.) Subsequently, the Attorney General of the State of Delaware was removed as a defendant by agreement of the parties. (D.I. 14, 20.) In addition, plaintiffs recently decided to abandon that part of their complaint challenging the proposed charter amendment, and a stipulation to dismiss

---

1. Plaintiffs argued that certain provisions of the Delaware Takeover Statute, under which a tender offeror is prohibited from commencing its offer until 20 days after notification to the target company, were preempted by the Williams Act, 15 U.S.C. §§ 78m–n, and SEC regulations promulgated thereunder, which require a tender offeror to commence its offer no later than five days after public announcement of the material terms. In *Kennecott Corp. v. Smith*, 637 F.2d 181 (C.A. 3, 1980), the Third Circuit Court of Appeals reversed the decision of the district court denying a preliminary injunction against enforcement of similar provisions contained in the New Jersey Takeover Statute. In so holding, the court found that the 20-day state provision was inimical to the purposes of the Williams Act and that the tender offeror was thus likely to succeed on his preemption claim. *Id.* at 187. In addition, the court held that the delay interposed by the New Jersey Act in and of itself constituted irrepara-

ble injury and that accordingly a preliminary injunction should have issued. *Id.* at 187–88. *See also Chromalloy American Corp. v. Sun Chemical Corp.*, 483 F.Supp. 116, 118 (E.D.Mo. 1980) (holding Delaware Takeover Statute preempted by Williams Act and improper burden on interstate commerce); *Dart Industries v. Conrad*, 462 F.Supp. 1, 14 (S.D.Ind.1978) (same). Based on the language of the opinion in *Kennecott*, courts in this district have temporarily enjoined the application of the Delaware Takeover Statute on at least three previous occasions. *See Dome Petroleum Limited v. Conoco et al.*, C.A. No. 81–179 (D.Del. May 6, 1981); *U.A. Entertainment, Inc. v. U.A.—Columbia Cablevision et al.*, C.A.No. 81–152 (D.Del. Apr. 15, 1981); *Crane Co. v. Harsco Corp. et al.*, C.A. No. 81–30 (D.Del. Jan. 26, 1981). Accordingly, faced with the foregoing facts, this Court granted the temporary restraining order requested by plaintiffs.

that count without prejudice was approved by the Court. (D.I. 25, 27.) The only issue now remaining in this action is plaintiffs' contention that the bylaw amendment enacted by Conoco's Board of Directors is invalid and unenforceable against Conoco's shareholders because it contravenes Delaware law. Before addressing this question, the Court will examine the factual background giving rise to this dispute.

## I. *Background*

The contested bylaw was formulated in response to an earlier tender offer in May 1981 by Dome Petroleum Limited ("Dome"), a Canadian corporation, to purchase 20% of Conoco's outstanding common stock. (D.I. 27 at 8.) The avowed purpose of Dome's offer was not to seek control of Conoco itself, but to increase Dome's bargaining leverage in its efforts to acquire Conoco's 53% interest in Hudson's Bay Oil and Gas Limited, a Canadian subsidiary of Conoco. (*Id.*) Although Conoco's Board of Directors steadfastly counseled its shareholders against accepting the Dome offer (*id.*), the offer was successful and Dome subsequently exchanged the 22 million Conoco shares it had acquired, plus a cash settlement, for Conoco's interest in the Canadian subsidiary. (D.I. 26 at A–47.)

In order to ward off future attempts by foreign concerns to acquire significant blocs of Conoco stock, the Board of Directors passed a resolution on May 18, 1981, adopting an amendment to the corporate bylaws, which purported to limit the number of shares which could be held by "alien" companies at any given time. The amended bylaw ("alien ownership restriction" or "bylaw") provides in pertinent part:

(i) Notwithstanding any other provision of these bylaws, any transfer, or attempted or purported transfer, of any shares of capital stock issued by the corporation or any interest therein or right thereof which would result in the owner-

ship or control by one or more Aliens of an aggregate percentage of the shares of all capital stock of the corporation or of any interest therein or right thereof in excess of any applicable Alien Permitted Percentage shall, to the full extent permitted by law, and for so long as such excess shall exist, be void and shall be ineffective as against the corporation and the corporation shall not recognize the purported transferee as a stockholder of the corporation for any purpose whatsoever except for the purpose of making a further transfer which will cause such excess to be reduced or eliminated and not otherwise be prohibited under this subsection (i);

Article XVIII, Section 5(b)(i). (D.I. 23A at A–84.)

"Alien" is broadly defined in the bylaw to include *inter alia* any "person," including an individual, partnership or corporation, who is not a United States citizen, any corporation in which the president, chief executive officer or chairman of the board is not a United States citizen, and any corporation organized under the laws of a foreign government. In addition, a corporation which is 20% owned or controlled, directly or indirectly, by aliens or who acts as a representative or fiduciary for an alien, is itself classified as an alien for purposes of the bylaw. Article XVIII, Section 5(c)(i). (D.I. 23A at A–85.) The bylaw further vests the Board of Directors with broad discretion to establish the applicable "Alien Permitted Percentage." Shares held by all aliens may not exceed, in the aggregate, 20% of the outstanding shares of capital stock of the corporation or such other percentage as the Board may deem necessary. Article XVIII, Section 5(c)(ii) (D.I. 23A at A–85.) In addition, the Board is empowered to set separate "Alien Permitted Percentages" to govern all shares held by aliens of individual foreign countries.[2] In establishing these percentages, the Board is to insure that alien holdings of Conoco

---

2. Thus, the Board could decide, for example, to set an "Alien Permitted Percentage" for Iran of 10%. Henceforth, the Board could refuse to recognize transfers of stock to Iranian "aliens" which would result in an aggregate holding of shares by "aliens" of that country in excess of 10%.

stock will not, under federal or state law, be likely to hinder or prevent the corporation from conducting any business in which it is now engaged, or which it is contemplating. *Id.* Finally, the Board may suspend the effectiveness of the bylaw at any time or for any period during which, in the Board's judgment, the restrictions are unnecessary to the conduct of any business or contemplated business of the corporation. Article XVIII, Section 5(a). (D.I. 23A at A–84.)

Every stock certificate issued by Conoco on the transfer of authorized and outstanding shares, since the bylaw was adopted on May 18, 1981, has been imprinted with a legend alerting the holder to the alien ownership restriction. Approximately 30,111 legended stock certificates representing 59,637,806 shares of Conoco stock have been issued since that date. (D.I. 27 at 17.)

Seagram is a corporation organized under the laws of Indiana with its principal place of business in New York. It is a wholly-owned subsidiary of The Seagram Company, Ltd., a corporation organized under the laws of Canada and a principal producer and marketer of liquor and wine. JES is a wholly-owned subsidiary of Seagram which was organized for the sole purpose of making a cash tender offer for Conoco stock. (D.I. 1 at ¶¶ 10, 11.) Plaintiffs claim, and Conoco concedes, that Seagram and JES qualify as "aliens" under the Conoco bylaw. (D.I. 1 at ¶ 50; D.I. 18 at ¶ 50.)

On May 29, 1981, Seagram opened negotiations with Conoco aimed at a possible substantial acquisition of Conoco stock. (D.I. 23A at A–11; D.I. 27 at 17–18.) As part of a draft agreement submitted to Conoco, Seagram proposed that the alien ownership restriction be rescinded (*id.*). Negotiations subsequently broke down, however, and at a meeting held on June 17, 1981, Conoco formally rejected Seagram's offer to make a significant investment in Conoco. (D.I. 23A at A–12; D.I. 27 at 18.) Within the next two days, JES acquired 143,800 shares of Conoco stock in open market purchases (D.I. 23A at A–8), and on June 25, 1981, Seagram announced that JES would commence a cash tender offer for up to 35,000,-000 shares or 41% of the outstanding stock of Conoco at a price of $73 per share. (*Id.* at A–1.) Simultaneously with the announcement of the tender offer, Seagram and JES filed this action. The Court granted the plaintiffs' motion for expedited discovery and briefing, both parties submitted memoranda on the legal questions posed by the adoption of the alien ownership restriction, and a hearing on this issue was held on July 13, 1981.

During the pendency of the proceedings in this Court, Conoco and E.I. DuPont de Nemours & Co. ("DuPont") signed a merger agreement under which DuPont consented to pay Conoco shareholders $87.50 for each share tendered, or to exchange 1.6 shares of DuPont stock for each Conoco share held. In response to this development, Seagram modified its original cash tender offer and now seeks to acquire 51% of the outstanding shares of Conoco at a purchase price of $85.00 per share. Recently, Mobil Oil Co. announced its own tender offer to gain control of Conoco, and DuPont, Seagram and Mobil Oil Co. are now engaged in a bidding war which has been well chronicled in the financial pages of the major newspapers in this country. In addition, rumors are adrift that other major corporations may enter the fray and make independent bids for control of Conoco. It is against this backdrop that the Court must consider the validity of the alien ownership restriction.

## II. *The Parties' Contentions*

Plaintiffs argue that the alien ownership restriction is unenforceable because it does not satisfy the Stock Transfer provisions of the Delaware General Corporation Law. Section 202 of that law provides in pertinent part:

(a) A written restriction on the transfer or registration of transfer of a security of a corporation, if permitted by this section and noted conspicuously on the security, may be enforced against the holder of the restricted security or any successor or transferee of the holder .... Unless noted conspicuously on the securi-

ty, a restriction, even though permitted by this section, is ineffective except against a person with actual knowledge of the restriction.

(b) A restriction on the transfer or registration of transfer of securities of a corporation may be imposed either by the certificate of incorporation or by the by-laws or by an agreement among any number of security holders or among such holders and the corporation. No restriction so imposed shall be binding with respect to securities issued prior to the adoption of the restriction unless the holders of the securities are parties to an agreement or voted in favor of the restriction.

(c) A restriction on the transfer of securities of a corporation is permitted by this section if it:

\* \* \* \* \* \*

(4) Prohibits the transfer of the restricted securities to designated persons or classes of persons, and such designation is not manifestly unreasonable.

8 *Del.C.* § 202(a), (b), (c)(4).

Plaintiffs contend that enforcement of the bylaw violates § 202 in two principal respects. First, plaintiffs argue that in implementing the bylaw, Conoco has failed to comply with the procedural requirements of § 202(b), which provides that a transfer restriction shall not be binding "with respect to *securities issued prior to the adoption of the restriction* unless the holders of the securities are parties to an agreement or voted in favor of the restriction." (Emphasis added.) (D.I. 23 at 8.) Under this provision, plaintiffs argue, the alien ownership restriction cannot be imposed on shares of stock which were issued and outstanding on May 18, 1981, the time the bylaw was adopted, unless the holder of the shares consents to the restraint. (*Id.* at 9.) Plaintiffs claim, and Conoco does not dispute the fact, that no new shares have been issued by Conoco since May 18, 1981. (*Id.*) Thus plaintiffs conclude that Conoco's acknowledged practice of mechanically imprinting all stock certificates issued after May 18, 1981 with a legend notifying the holder of the alien ownership restriction is invalid, and in the absence of the shareholder's affirmative consent, the shares represented by those certificates cannot be subject to the transfer restriction. (*Id.* at 10.)

Plaintiffs' second challenge to the bylaw centers on § 202(c)(4) which provides that restrictions placed on stock transfers to designated persons or classes of persons are valid, so long as the designation is "not manifestly unreasonable." Plaintiffs argue that the putative harm occasioned by foreign ownership of Conoco stock, which is cited by Conoco as the basis for the bylaw, is wholly speculative and arbitrary. (D.I. 23 at 13–14.) These justifications purportedly are mere pretexts to camouflage the Board's true intention to stymie otherwise legitimate tender offers and to entrench current management. (*Id.* at 13.) Moreover, even if the Court accepts Conoco's argument that a substantial negative impact will result from alien stock ownership, plaintiffs contend that the bylaw is manifestly unreasonable because it arrogates to the Board total authority to reduce, increase or eliminate the Alien Permitted Percentage, at any time, without prior notice to Conoco's shareholders. (*Id.* at 15–17.) Consequently, the restriction will inject an unsettling uncertainty into the market for Conoco shares and shareholders will be unable safely to predict whether a given transfer to an alien will run afoul of the ownership restriction. (*Id.* at 15.)

In response, Conoco points out that the term "securities" as used in § 202(b) means "certificates" and, accordingly, while certificates issued prior to the adoption of the bylaw cannot be burdened by the alien ownership restriction, certificates issued by the corporation after May 18, 1981, clearly are bound by its terms. (D.I. 27 at 22–23.) In addition, Conoco argues that the bylaw was formulated for sound business reasons, *viz.*, to insure that foreign ownership of Conoco's capital stock would not impede the company's ability "to hold, obtain or reinstate a license or franchise from a government agency" necessary to the conduct of existing or contemplated business. Article

XVIII, Section 5(a). (D.I. 23A at A–83.) Moreover, the Board's discretion unilaterally to suspend or alter the application of the bylaw purportedly is not without limits, but can be exercised only when necessary to fulfill the salutary purposes of the restriction. Article XVIII, Section 5(a), (c)(ii). (D.I. 23A at A–85.) Finally, Conoco further claims that under the certification procedures adopted in connection with the bylaw, Conoco's transfer agents will monitor the number of alien stockholders on a continuing basis and a stockholder could easily ascertain whether a proposed transfer is valid under the bylaw simply by consulting the agent. (D.I. 27 at 39.) Thus, Conoco concludes that plaintiffs have failed to demonstrate that the alien ownership restriction is manifestly unreasonable under § 202(c)(4).

### III. Discussion

. At the outset, it is clear that the only issue properly before the Court at this juncture is whether Conoco's actions in imposing the alien ownership restriction on all certificates newly issued after May 18, 1981, on the transfer of authorized and outstanding shares, were in compliance with § 202(b). Although both sides have briefed and argued the substantive issue of the bylaw's "reasonableness" under § 202(c)(4), that question cannot be resolved without full development of the facts underlying the promulgation of the bylaw. Since these facts have not yet been presented to the Court, the issues raised by § 202(c)(4) must be reserved for another day. In addition, the Court cannot determine on the present record whether any of Conoco's shareholders have consented to, and thus committed their shares to, the terms of the alien ownership restriction and that question similarly must await further factual exposition.

■  Pared to its essentials then, the task confronting the Court is essentially one of statutory construction: Does the term "securities" as used in § 202(b) mean outstanding capital shares, as plaintiffs contend, or, as Conoco urges, does it mean only certificates.[3] The Courts of Delaware have not yet construed the meaning of the term "securities" as used in § 202(b). Accordingly, it is the duty of this Court to interpret the statute in a manner most reasonably approximating what the Supreme Court of Delaware would decide if confronted with this issue. *Wilmington Supply Co. v. Worth Plumbing & Heating, Inc.*, 505 F.Supp. 777, 779 (D.Del.1980); *Wilmington Trust Co. v. Mutual Life Ins. Co.*, 68 F.Supp. 83, 85–86 (D.Del.1946).

■  As a preliminary matter, the Court observes that under general canons of statutory construction, where the language of a statute conveys a clear and definite meaning, the Court must give full literal effect to that meaning. *Federal United Corporation v. Havender*, 24 Del.Ch. 318, 11 A.2d 331, 337 (1940); *State ex rel. State Bd., etc. v. Dineen*, 409 A.2d 1256, 1260 (Del.Ch. 1979). The word "securities," however, is neither defined in the General Corporation Law, "nor is there an accepted definition in common usage." *Mosley v. Bank of Delaware*, 372 A.2d 178, 179 (Del.Supr.1977). Accordingly, because the term is ambigu-

---

**3.** One comment must be noted at this point. Under either party's interpretation of § 202(b), a shareholder who has not previously transferred his Conoco shares to any purchaser after May 18, 1981, may tender his shares to Seagram without concerning himself with the alien ownership restriction. Because the shareholder would hold a certificate issued prior to May 18, 1981, he would not be directly bound by the terms of the bylaw and could transfer his share to any purchaser he chooses. That purchaser, in turn, would receive a legended certificate and would be bound by the alien ownership restriction. However, the bylaw would not operate to divest the purchaser himself of owner-

ship of the share but would only prevent him from further transferring the share to an "alien." Thus, theoretically, if Seagram purchased Conoco shares from holders of unlegended certificates, it could exercise full ownership rights over these shares and would be restricted only in its ability to further transfer these shares to "aliens." Because certificates representing over 59 million shares of Conoco's approximately 100 million outstanding shares have already been legended, however, it is unlikely that Seagram will be able to acquire enough shares from holders of unlegended stock certificates to reach its 51% goal.

ous, the Court must ascertain what the Legislature intended to ascribe to the term in § 202(b). *See Mosley v. Bank of Delaware, supra,* 372 A.2d at 179; *Providence & Worcester Co. v. Baker,* 378 A.2d 121, 122–23 (Del.Supr.1977); *A&P Stores v. Hannigan,* 367 A.2d 641, 643 (Del.Supr.1976); *Marvel v. State,* 312 A.2d 318, 322 (Del. Supr.1974); *Council 81, Amer. Fed. of State, Cty. & Municipal Employees v. Dept. of Finance,* 293 A.2d 567, 569–70 (Del.Supr. 1972). In the absence of clear statutory history or other explicit guidelines, the Court must interpret § 202 in accordance with its view of "the most reasonable assumptions, as to legislative intent, to be drawn from the language used." *Opinion of the Justices,* 352 A.2d 406, 408 (Del.Supr. 1976).

■ Despite their valiant efforts to illuminate the unanswered questions created by § 202(b), there is little solid precedent in Delaware law to support the interpretation of that provision embraced by either party. *See B&H Warehouse, Inc. v. Atlas Van Lines, Inc.,* 490 F.2d 818, 821 (C.A.5, 1974). Nonetheless, the Court finds that the language of § 202(b) itself, the meager legislative history pertaining to that provision, and the most reasonable assumptions to be drawn therefrom, compel the Court to adopt plaintiffs' position.

The use of the term "securities" in § 202 stands as somewhat of an anomaly when compared with the other provisions of the General Corporation Law. Apparently in only one other section, § 123, does the term "securities" figure prominently. Most of the remaining sections of the law generally apply to either "stock," or "certificates" and the distinction between these two concepts is made quite clear: stock, or shares, is the underlying ownership interest in the corporation, while a certificate is merely evidence of that ownership or the muniment of title. *Compare* 8 *Del.C.* § 151 (classes and series of stock; rights); 8 *Del.C.* § 152 (issuance of stock; lawful consideration); 8 *Del.C.* § 153 (consideration for stock); 8 *Del.C.* § 155 (fractions of shares); 8 *Del.C.* § 160 (corporations, powers respecting ownership of stock); and 8 *Del.C.* § 201 (transfer of stock and stock certificate) *with* 8 *Del.C.* § 158 (stock certificate); 8 *Del.C.* § 167 (lost, stolen or destroyed stock certificates); and 8 *Del.C.* § 168 (judicial proceedings to compel issuance of new certificate).

The choice of the term "securities" in § 202 has been explained by Professor Earnest Folk, the reporter for the Delaware revision commission which prepared the amended General Corporation Law for submission to the Legislature in 1967. In his comments on § 202, Professor Folk notes that the primary purpose of § 202 was to validate "a wide array of stock transfer restrictions" not previously recognized at common law, and that in this respect, the Delaware statute "goes far beyond any other American statute." Folk, *The Delaware General Corporation Law,* 197–98 (1972) ("Folk"). *See St. Louis Union Trust Co. v. Merrill Lynch, etc.,* 562 F.2d 1040, 1046 (C.A.8, 1977). In accordance with the commission's liberal acceptance of transfer restrictions, it was decided that § 202 would apply to all corporate securities, *i.e.,* "it is not limited to stock, but includes creditor securities, such as bonds or debentures convertible into common stock, options and so on." Folk at 197. Thus, the term "securities," and not stock, was pointedly employed by the commission in § 202(b) because it wanted that provision to reach a wider class of interests than mere capital shares, namely, bonds, convertible debentures, options and other forms of corporate ownership or indebtedness.

Section 123 of the General Corporation Law uses the term "securities" in a context similar to that described by Folk in his comments to § 202. Under this provision, Delaware corporations are authorized *inter alia* to acquire, hold, vote and dispose of "bonds and other obligations of, or shares or other *securities* or interests in," other corporations and entities. 8 *Del.C.* § 123 (emphasis added); Folk at 39. *See also* 8 *Del.C.* § 157. Section 123 further adds that a Delaware corporation, which owns securities of another entity, may exercise all rights, powers and privileges of ownership, including the right to vote. Both the word-

ing of § 123, by analogy, and the statutory history of § 202 support plaintiffs' claim that "securities" as used in § 202(b) was intended to mean *inter alia* a substantive ownership interest in capital stock and not the indicia of ownership represented by the stock certificate.[4]

█ Moreover, any other construction of § 202(b) would fail to take due account of this well settled principle of Delaware law that a certificate of stock is only evidence of share ownership and is not the stock itself. *See Brown v. Fenimore*, 3 Del.J. Corp.L. 552 (Del.Ch.1978); *Smith v. Universal Service Motors, Co.*, 17 Del.Ch. 58, 147 A. 247, 248 (1929); *Baker v. Bankers Mtg. Co.*, 15 Del.Ch. 209, 135 A. 486 (1926), *aff'd*, 141 A. 277 (Del.Supr.1927); 8 *Del.C.* § 201; Folk at 144. Although a certificate of stock, like all muniments of title, is a valuable paper, the possession of which facilitates the sale and transfer of the underlying ownership interest, *Smith v. Universal Service Motors, Co., supra*, at 248, possession of the certificate is not essential to the creation of the shareholder relationship. Folk at 144. "Stockholder status is created instead by the subscription to stock and its acceptance by the corporation," *id.*, and the issuance of shares of stock, accordingly, need not be accompanied by the physical printing and distribution of certificates. *Haskell v. Middle States Petroleum Corp.*, 165 A. 562 (Super.Ct.1933); *Mau v. Montana Pac. Oil Co.*, 141 A. 828 (Del.Ch.1928). Because the transfer restrictions validated by § 202 clearly are designed to burden the actual exercise of ownership rights vested in the shareholder, such restrictions can be binding only if imposed on the underlying share of stock itself and not on the mere muniment of title.

The Court further believes that plaintiffs' construction of § 202(b) is the only logical interpretation which can be drawn from the language of the statute. Adoption of Conoco's position would produce the incongruous result of allowing the Board of Directors unilaterally to impose stock transfer restrictions, which might be of significant economic consequence, on existing shares without the consent of the corporation's shareholders. Under Conoco's interpretation of § 202(b), once a shareholder decides to sell his shares and the purchaser tenders the unrestricted certificates to the corporation for transfer of title and recordation, whether either shareholder or purchaser affirmatively consents or not, the corporation will affix a legend to the certificate which will bind the purchaser to the terms of the alien ownership restriction. Although, as noted previously, the first purchaser of Conoco shares after May 18, 1981, could not himself be divested of ownership of the share under the bylaw, he would not be able to transfer his stock freely to any subsequent purchaser, and this factor undoubtedly would affect his decision to purchase the Conoco stock in the first instance. Furthermore, taken to its logical conclusion, adoption of Conoco's position would mean that the mere replacement of stock certificates which were mutilated, lost or otherwise destroyed, could subject the holder of the stock to the alien ownership restriction even though no change in ownership had occurred. Under either of these scenarios, restrictions which could involve serious limitations on the free alienation of stock and could severely circumscribe an existing shareholder's market for selling Conoco stock would be imposed without the consent of the shareholder. The only recourse of a disgruntled share-

---

4. Folk's only other pertinent comment on § 202(b) was to note that "a restriction, however imposed, is not retroactive in effect except as to consenting security holders, *i.e.*, those who are parties to an agreement or who voted in favor of a restriction (as in the case of a bylaw or certificate amendment)." Folk at 198. Conoco argues that this statement suggests that the alien ownership restriction may be imposed *prospectively* on all shareholders whether they consent to the restriction or not;

any purchaser that acquires its shares of Conoco stock after May 18, 1981, may be subject to the restriction notwithstanding the fact that the shares may have been issued and outstanding on May 18, 1981. Although this argument has superficial appeal, the Court believes the more reasoned interpretation of Folk's statement is that the bylaw could not be applied to existing unrestricted shares created and issued prior to the time the bylaw was adopted, without the consent of the shareholder.

holder, who disagreed with the terms of the bylaw, would be to refrain from transferring his stock altogether, or, in the event his certificate was destroyed, to forego requesting the corporation to issue a replacement. The Court believes that this situation would effectively vitiate the consent requirement of § 202(b) and that the Legislature could not reasonably have intended to produce such onerous results. *Accord,* Note, *Section 202 of Delaware Corporation Law—Per Se Rules For Stock Transfer Restrictions,* 9 B.C.Ind. & Com.L.Rev. 405, 422 (1968) (reading § 202(b) as requiring consent of shareholders to restrictions placed on shares of capital stock created and issued prior to adoption of restriction.) [5]

Conoco points out, however, that Subsection (a) of § 202 states that transfer restrictions must be "noted conspicuously on the security" and that in this context "security" can only mean "certificate." Accordingly, Conoco reasons that the Legislature intended § 202(b) to be read in the same manner as 202(a) and that transfer restrictions may be imposed on shareholders through the issuance of new certificates.

It is apparent that as used in § 202(a), "security" was intended to denote some muniment of title.[6] Nonetheless, the Court believes that this factor, standing alone, is too fragile a connection on which to base the Court's interpretation of § 202(b). The object of statutory construction is to give a sensible and practical meaning to the statute under consideration, consistent with the intent of the Legislature. *See Nationwide Mutual Insurance Co. v. Krongold,* 318 A.2d 606, 609 (Del.Supr.1974). To adopt a construction of § 202(b) which would implement Conoco's interpretation of that section, in the face of the reasoning cited earlier in this opinion, would lead to illogical and unjust consequences which could not have been intended by the Legislature. *Id.* Although the Court's ruling has the unusual effect of interpreting the term "security" in two distinct ways for purposes of Subsections (a) and (b), it is not unrealistic to speculate that in their zealous efforts to rework the law of transfers of securities, including shares of stock, the draftsmen of the revised corporation law simply overlooked this inconsistency.

For the reasons discussed in this opinion, the Court concludes that under § 202(b) of the General Corporation Law, Conoco's alien ownership restriction may not be imposed on shares of capital stock of Conoco issued and outstanding before May 18, 1981, unless the holder of the share consents to the restriction, *i.e.,* it is a party to an agreement or voted in favor of the restriction.

An order granting in part plaintiffs' request for injunctive relief will be entered in accordance with this memorandum opinion.

---

**5.** Under the terms of § 202(b), Conoco could impose the alien ownership restriction on shares of capital stock issued and outstanding on May 18, 1981, if the shareholder assents to the restriction. Clearly, this assent cannot be implied from the fact that the shareholder purchased his share after May 18, 1981, with knowledge of the terms of the bylaw, since § 202(b) expressly provides that the shareholder must be a "part[y] to an agreement or [have] voted in favor of the restriction," and acceptance of this construction of consent would produce the very same inequitable and unreasonable consequences which the Court has already rejected as inconsistent with legislative intent. Conoco could attempt to secure the consent of its shareholders to the bylaw, however, by submitting the matter to a vote at the next shareholders' meeting or by otherwise negotiating individual agreements with its shareholders to abide by the terms of the restriction.

**6.** Section 202(a) had its genesis in § 194 of the old General Corporation Law which expressly provided that transfer restrictions would not be recognized unless they were "stated upon the certificate" issued by the corporation. *See* Laws of Delaware of 1945, Vol. 45, Chapter 159, § 16P; Arsht & Stapleton, *Analysis of the 1967 Delaware Corporation Law,* Prentice Hall Corp.—Delaware 311, 332–33 (1967). In the 1967 revision, this concept was retained and expanded to bring it into conformity with the Uniform Commercial Code, 6 *Del.C.* § 8–204; Folk at 197, which similarly provides that transfer restrictions must be "noted conspicuously on the security." Apparently, the language of § 202(a) was lifted from this U.C.C. provision without any consideration to the use of the term "securities" in § 202(b).