Steven HARLAMERT, Plaintiff,

v.

WORLD FINER FOODS, INC., Defendant.

No. 3:02cv089.

United States District Court,
S.D. Ohio,
Western Division.

March 31, 2006.

Scott Lloyd Braum, Scott L. Braum & Associates, Ltd., Dayton, OH, Thomas Patrick Whelley, II, Rachael Leigh Rodman,

Chernesky Heyman & Kress, Dayton, OH, for Plaintiff.

Frank Holahan, McElroy Deutsch Mulvaney & Carpenter, Ridgewood, NJ, Brian Donald Wright, Faruki Ireland & Cox PLL, Dayton, OH, for Defendant.

FINDINGS OF FACT AND CONCLUSIONS OF LAW; OPINION; JUDGMENT TO BE ENTERED IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT; TERMINATION ENTRY

RICE, District Judge.

This litigation arises out of a dispute between the parties concerning the question of whether ten shares of stock of Defendant World Finer Foods, Inc., which had been owned by John Harlamert, deceased, are subject to a shareholder agreement which is applicable to certain shares of Defendant's stock. The Defendant contends that those ten shares of its stock are subject to that agreement and that, therefore, the corporation has the right to redeem them for 80% of their book value. Plaintiff, on the other hand, contends that the shareholder agreement is inapplicable and that, therefore, John Harlamert's estate is free to transfer those shares to him in his individual capacity. Plaintiff initiated this litigation in order to obtain declaratory relief, permitting that transfer. On March 21, 2005, this matter was heard by the Court sitting as the trier of fact. The parties have made their post-trial submissions. *See* Docs. # # 62 and 63. Now, in accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court sets forth its Findings of Fact separate from its Conclusions of Law.

*I. Findings of Fact (Arrived at a Preponderance of the Evidence)*

1. Plaintiff Steven Harlamert ("Plaintiff"), a citizen of the state of Ohio, is the

Administrator of the estate of John Harlamert ("Harlamert"), his deceased father, who died on October 13, 1994. Plaintiff brings this litigation in his individual capacity and as Administrator of Harlamert's estate. Over the years, Harlamert founded and owned a number of companies which are involved in the food industry, including Arlowe Specialty Food Company, Inc. ("Arlowe").

2. Defendant World Finer Foods, Inc. ("Defendant" or "WFF"), is a corporation incorporated under the laws of Delaware, with its principal place of business located in New Jersey. WFF was incorporated as V.I.P. Foods Company ("V.I.P."), in August, 1971. In April, 1980, V.I.P. changed its name to Reese Finer Foods, Inc. ("Reese"). Reese, in turn, changed its name to WFF in July, 1994.[1] WFF is a food cooperative and distributor of specialty foods, which are sold to regional distributors. Some of those distributors are shareholders of WFF.

3. When V.I.P. was incorporated in August, 1971, it had five shareholders, to wit: John Fressie ("Fressie"), Gary Greenhouse ("Greenhouse"), Harry Mains ("Mains"), Jack Heffner ("Heffner") and Norman Wine ("Wine"). Each of those shareholders was issued 200 shares of stock. All of the shareholders, except Fressie, were distributors of food. Fressie ran a company which manufactured food products, such as popcorn seasonings.[2] Fressie continued to operate that company after V.I.P. was formed, and V.I.P. distributed the products manufactured by his company. The purpose of V.I.P. was to act as a food cooperative which would provide its shareholders/distributors a reliable source of products at favorable prices.

4. During the first meeting of V.I.P., which was conducted on August 20, 1971, the shareholders present agreed that there would be a buy-sell agreement, under which V.I.P. would be given the first option of purchasing original stock, at its book value, within 90 days.[3] During the next meeting of V.I.P., conducted on October 30, 1971, the issue of a proposed buy-sell agreement was tabled, at the request of Greenhouse. As a result of that meeting, as of the date of the second meeting, a buy-sell agreement between V.I.P. and its shareholders did not exist. Since Harlamert did not become a shareholder of V.I.P. until March 3, 1972, he did not attend either of the meetings conducted in 1971.

5. In late February, 1972, the five initial shareholders decided that each would return 190 of the shares that had been originally issued to each of them. As a result, each of the original five shareholders owned ten shares of V.I.P. stock. That permitted V.I.P. to increase the number of its shareholders without also increasing the number of its authorized shares. The next month, V.I.P. expanded its number of shareholders from five to eleven.

6. On March 3, 1972, Harlamert and five others each purchased ten shares of V.I.P. stock. Harlamert also became a

---

1. Throughout this Decision, the Court will endeavor to use the name which Defendant was using at the time the events under discussion occurred. Thus, it uses "V.I.P." in its discussion of Harlamert becoming a shareholder in 1972. Nevertheless, it must be remembered that WFF, Reese and V.I.P. are nothing more than different names for the same corporate entity.

2. Fressie was the leading force behind the creation of V.I.P., and ran that company until 1988, when he was forced out by disgruntled shareholders and replaced by John Beers. Fressie subsequently sued and settled that suit for a substantial sum.

3. Four of the five original shareholders were present. Only Wine was absent.

distributor of products manufactured by V.I.P., through Arlowe. He was issued stock certificate No. 7, which contains the typewritten statement that the shares can be transferred only through the company and in compliance with an agreement between the shareholder (Harlamert) and V.I.P. Such agreement between Harlamert and V.I.P. does not exist.

7. The minutes for shareholders meeting which was conducted on March 3, 1972, the day the number of shareholders was expanded from five to eleven,[4] provide that the resolution on the face of the shares of stock eliminates the need for a buy-sell agreement.[5]

8. Since March 8, 1972, a number of other shareholders of V.I.P., Reese or WFF have entered into shareholder agreements, which are exemplified by Defendant's Exhibit No. 1. Under such an agreement, the estate of a deceased shareholder is required to sell, and WFF required to buy, the shareholder's stock for the greater of $40 per share or 80% of book value. The sale is to take place within 30 days of the shareholder's death. The agreements which were executed on March 8, 1972, are in conformity with Defendant's Exhibit No. 1.

9. On March 8, 1972, four of V.I.P.'s eleven shareholders executed shareholders agreements. The other seven shareholders, including Harlamert, did not, at that time, execute such agreements.[6]

10. Given that only four of eleven shareholders signed shareholder agreements and, then, on March 8, 1972, five days after the March 3rd meeting, the court finds that the shareholders of V.I.P. did not agree, on March 3, 1972, that their ownership of the shares of that corporation would be governed by such agreements. This finding is further buttressed by the minutes of that meeting which provide that the need for a buy-sell agreement was eliminated.

11. A shareholder agreement exemplified by Defendant's Exhibit No. 1 differs from the buy-sell agreement to which shareholders of V.I.P. agreed during its initial meeting, conducted on August 20, 1971. That buy-sell agreement merely afforded V.I.P. a first option of purchasing its shares, while a shareholder agreement gives V.I.P., Reese or WFF the right to redeem its shares upon the death of a shareholder. In addition, the buy-sell agreement put the purchase price at 100% of book value, while under a shareholder agreement the purchase price is the greater of $40 per share or 80% of book value.

12. Although Harlamert died on October 13, 1994, Defendant did not attempt to redeem his shares until January 31, 1995, more than 30 days after his death, by tendering a check in the amount of $43,240.68, to James Kordik, who had been Harlamert's attorney. Plaintiff and his sister, Harlamert's two heirs, have refused to tender their father's shares of WFF. Rather, Harlamert's estate has received permission from the Montgomery County Probate Court to transfer his ten shares of

4. The new shareholders, in addition to Harlamert, were Joe Barzizza, Jones Food Company, Sidney Knight, Art Kehe and Samuel Zuckerman Company.

5. Presumably, the resolution referenced in the minutes of that meeting is the typewritten statement on the certificates issued on that day that the shares could be transferred only through the company and in compliance with

an agreement between the shareholder and V.I.P. There was no evidence that the shareholders agreed on any resolution during that meeting.

6. Greenhouse, one of the seven shareholders who did not enter into a shareholder agreement at that time, did execute such agreements in 1988 and 1990.

WFF to Plaintiff. That transfer has not occurred, because WFF will not permit it.

13. Harlamert never executed any type of shareholder agreement with V.I.P., Reese or WFF. In addition, he was not aware on March 3, 1972, when he purchased his shares of V.I.P., that there was in existence a type of shareholder agreement between that company and its shareholders, as exemplified by Defendant's Exhibit No. 1, under which V.I.P. would have the right to redeem his shares upon his death. Indeed, there is no evidence that a shareholder agreement containing terms consistent with that Exhibit was even in existence on March 3rd. Such an agreement is not mentioned in the record until March 8th, five days later. In addition, Harlamert did not accept any benefits of such an agreement between V.I.P., Reese or WFF and their shareholders.

## II. Opinion

At the conclusion of the presentation of the testimony in this matter, the Court and counsel discussed the admissibility of the exhibits. The Court took the admissibility of Defendant's Exhibits 16 and 30–A under advisement. *See* Transcript of March 21, 2005 Trial (Doc. # 61) at 281–85. Therefore, the Court initially turns to the admissibility of those exhibits, before turning to the merits of Plaintiff's request for declaratory relief.[7]

■ Defendant's Exhibit No. 16 purports to be a copy of the minutes of the meeting of Reese's Board of Directors, held on November 21, 1985. During the trial, the Court sustained Plaintiff's objections to questions about that exhibit, since Defendant had not introduced evidence, establishing that this exhibit is an authentic business record. *Id.* at 216. Since that exhibit was authenticated by Fressie during his deposition (*see* Fressie Dep. at 53), the transcript of which has been introduced into evidence, the Court admits Defendant's Exhibit No. 16 into evidence and has considered it when ruling on the merits of this dispute.

■ Defendant's Exhibit No. 30–A is a copy of a declaration of John Bennett, an attorney who had previously represented Reese, which was filed in the lawsuit Fressie filed after having been dismissed by Reese. Quite simply, Bennett's declaration is an out of court statement offered to prove the truth of the matters set forth therein. Therefore, that document is hearsay. *See* Fed.R.Evid. 801(c). Since Defendant, the proponent of that exhibit, has not identified an exception to the hearsay rule under which Bennett's declaration would be admissible, the Court concludes that Defendant's Exhibit No. 30–A is inadmissible hearsay. Consequently, that document will not be considered when ruling on the merits of this dispute.

■ Having resolved the outstanding evidentiary issues, the Court turns to those merits, beginning its analysis by deciding what substantive law it must apply in order to resolve this dispute. Plaintiffs

---

7. During the trial, the Court permitted Plaintiff to introduce conditionally, over Defendant's objection, evidence that Harlamert had the habit of not willingly signing legal documents. Doc. # 61 at 66. The Court indicated that it would show a continuing objection to such testimony on behalf of Defendant and permitted it to raise the question in its post-trial submission. *Id.* Plaintiff apparently introduced the habit evidence in order to buttress his premise that Harlamert did not sign a shareholder agreement. Defendant has not challenged the admissibility of that evidence in a post-trial submission. On reflection, the Court sustains that objection. The testimony concerning Harlamert's habit has not influenced this Court in any manner with regard to its finding that Harlamert did not sign a shareholder agreement, given that the other evidence has compelled that finding.

have invoked this Court's diversity jurisdiction; therefore, it must apply Ohio's choice-of-law principles. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In their memoranda, the parties have cited and relied upon the law of Delaware. Since both the Plaintiff and the Defendant have relied upon the law of Delaware, this Court will apply the substantive law of that state. However, even if one of the parties had argued that this Court should apply the law of a jurisdiction other than Delaware, this Court would have rejected that assertion. Under Ohio's choice-of-law principles, it is appropriate to apply the law of the jurisdiction in which a corporation has been incorporated in a case involving the issue of whether the transferability of its shares has been lawfully restricted. *Maurer v. Haines City Mobile Park & Sales*, 2002 WL 479771 (Ohio App.2002). Since Defendant was incorporated in the state of Delaware, Ohio's choice-of-law principles mandate that this Court apply that state's substantive law.

■ Defendant presents three theories why it is entitled to redeem the shares of WFF which Harlamert owned at the time of his death, to wit, 1) he entered into a shareholder agreement in the form of Defendant's Exhibit No. 1, with V.I.P., Reese or WFF, under which WFF has the right to redeem his shares for the greater of $40 per share or 80% book value upon his death; 2) Harlamert was aware that such a shareholder agreement existed when he purchased his shares of V.I.P., on March 3, 1972; and 3) Plaintiff is estopped from denying that Harlamert was bound by a shareholder agreement in the form of Defendant's Exhibit No. 1. Not surprisingly, the Plaintiff disagrees with each of those points. Above, the Court has found, based upon the preponderance of the evidence, that Harlamert did not enter into a shareholder agreement with V.I.P., Reese or WFF, that he was not aware of the existence of such an agreement when he purchased ten shares of V.I.P., and that he did not accept any benefits of such an agreement between V.I.P. Reese or WFF and their shareholders.[8] Therefore, the Court concludes that the Plaintiff is entitled to declaratory relief in the form set forth below. As a means of discussion, the Court discusses the Defendant's first two points together, following which it turns to the question of estoppel.[9]

### A. Shareholder Agreement and Actual Knowledge

■ Whether restrictions on the transferability of shares of stock are enforceable under the law of Delaware is governed by 8 Del. Ch. § 202. *Capital Group Companies, Inc. v. Armour*, 2005 WL 678564 (Del.Ch.2005). Under § 202(a), a

---

8. If the Court had found otherwise, it would be necessary to address Plaintiff's alternative argument that Defendant has waived its rights under a shareholder agreement, by failing to redeem Harlamert's shares within 30 days of his death, as required by the form of such agreements exemplified by Defendant's Exhibit No. 1.

9. The parties devoted a substantial amount of time attempting to prove or to disprove that Arlowe was a good or bad distributor, that a company owned by Harlamert was competing with Defendant and that Defendant was at-tempting to steal Arlowe's largest customer, Kroger Company. This evidence is irrelevant, since such evidence does not cause this Court to find that Harlamert did or did not enter into a shareholder agreement with V.I.P., Reese or WFF, that he was or was not aware of the existence of such an agreement when he purchased ten shares of V.I.P., or that he did or did not accept any benefits of such an agreement between V.I.P. Reese or WFF and their shareholders. Accordingly, it is not necessary for the Court to discuss such evidence further.

restriction on the transfer of shares, set forth conspicuously on the certificate, is effective. Section 202(a) also provides that, unless noted conspicuously on the certificate, a restriction "is ineffective except against a person with actual knowledge of the restriction." Section 202(b) provides that, although a restriction on the transfer of securities of a corporation may be imposed by an agreement among shareholders, "[n]o restrictions so imposed shall be binding with respect to securities issued prior to the adoption of the restriction unless the holders of the securities are parties to an agreement or voted in favor of the restriction." As can be seen, a restriction on the transferability of shares of stock is permissible under Delaware law, if the shareholder agrees to such a restriction or has actual knowledge of the restriction when the securities are issued to him.[10]

■ Above, the Court has found that Harlamert did not enter into a shareholder agreement with V.I.P., Reese or WFF in the form of Defendant's Exhibit No. 1., under which WFF would have the right to redeem his stock upon his death. That finding is based primarily on the fact that the evidence demonstrated beyond any possible doubt that, even though Defendant had diligently searched its records and that Plaintiff had diligently searched the records of his father and the companies he had owned, no one has discovered a shareholder agreement between Harlamert and the Defendant. Moreover, although Defendant possesses a file for each of the eleven shareholders of March 3, 1972, in which information concerning each is contained, a shareholder agreement pertaining to Harlamert was not discovered in his file. In addition, no one testified that he remembered seeing a such an agreement.

Nevertheless, Defendant argues that Harlamert must have signed such an agreement, because its shareholders have utilized a standard form of agreement since its inception in 1971. The evidence, however, belies that premise. For instance, a search of the files of the eleven shareholders of V.I.P., as of March 3, 1972, revealed that only four of them had signed agreements. Such an agreement was not found in the file of Greenhouse, the only one of those shareholders who testified at trial. Indeed, Greenhouse testified that, although he signed such agreements in 1988 and 1990, he could not remember signing one in 1971 or 1972. Moreover, as part of his estate plan, Harlamert made provision for the disposition of his ten shares of V.I.P. stock. Such planning would have been useless, if that corporation had the right to redeem Harlamert's stock upon his death, because he had entered into a shareholder agreement to that effect.

■ Accordingly, the Court has found that Harlamert did not enter into a shareholder agreement with V.I.P., Reese or WFF in the form of Defendant's Exhibit No. 1., under which WFF would have the right to redeem his stock upon his death.[11]

---

10. The statute would also permit a restriction on transferability, if the shareholder has voted in favor of same. Herein, there is neither evidence nor argument that Harlamert voted in favor of such a restriction.

11. Section 202(a) provides that a restriction on the transferability of stock which is conspicuously set forth on the certificate is effective. Herein, the certificate of stock issued to Harlamert conspicuously provided that the transfer of those shares were subject to an agreement between the company and the shareholder. Since the Court has found that no such agreement existed, the language on that certificate does not restrict its transferability.

The Court has also found, based upon the preponderance of the evidence, that, on March 3, 1972, Harlamert was not aware of a shareholder agreement under which Defendant would be permitted to redeem his ten shares of V.I.P. stock upon his death for the greater of $40 per share or 80% of book value. Although the original five shareholders of V.I.P. had agreed to a buy-sell agreement during their initial meeting on August 20, 1971, that agreement differed from the type of shareholder agreement exemplified by Defendant's Exhibit No. 1, in that the buy-sell agreement only gave V.I.P. a first option, rather than the right of redemption and the corporation would be forced to pay 100% of book value for the shares, rather than possibly the lesser sum of $40 per share or 80% of book value. In addition, the shareholders of V.I.P. negated that buy-sell agreement at their next meeting, conducted on October 30, 1971. Moreover, there is no evidence that Harlamert was aware of that buy-sell agreement. Indeed, given that he did not become a shareholder of V.I.P. until March 3, 1972, he did not attend either the initial or second meeting held in 1971.

Therefore, the question becomes whether a shareholder agreement, which, like Defendant's Exhibit No. 1, gave V.I.P. the right to redeem a shareholder's shares upon his death, was adopted during the March 3, 1972, shareholders' meeting, when Harlamert became a shareholder.[12] Two pieces of evidence support that proposition; however, other evidence contravenes each of the supportive pieces of evidence. *First,* the stock certificate which was given to Harlamert bears the typewritten statement that the shares can be transferred only through the company and in compliance with an agreement between the shareholder (Harlamert) and V.I.P. The value of that statement as proof that such an agreement existed is defeated by the fact that the minutes for that meeting provide that the need for a buy-sell agreement has been eliminated. *Second,* while the fact that four of V.I.P.'s eleven shareholders signed shareholder agreements on March 8, 1972, which are consistent with Defendant's Exhibit No. 1, creates an inference that the shareholders agreed to such on March 3, 1972, that evidence does not, however, cause this Court to alter the above factual finding, given that the other seven of those shareholders did not sign such agreements on or near March 3, 1972. If, as Defendant would have the Court find, the shareholders of V.I.P. had agreed on a shareholder agreement in the form of Defendant's Exhibit No. 1, one would have expected that more than four of eleven shareholders would have executed such an agreement. Another significant piece of countervailing evidence is that the first mention in the record of a shareholder agreement with terms consistent with those contained in Defendant's Exhibit 1 is March 8, 1972, five days after Harlamert obtained his shares of V.I.P. stock. Since the countervailing evidence is more persuasive than the statement on the stock certificate and the fact that four shareholders signed agreements on March 8, 1972, five days after Harlamert had acquired his shares of V.I.P., the Court has found that Harlamert did not have actual knowledge of the existence of a shareholder agreement consistent with the terms on Defendant's Exhibit No. 1 on March 3, 1972, when he acquired those shares.[13]

---

**12.** Given that Harlamert was at that meeting, he had actual notice of all agreements made during it.

**13.** There was also evidence that Fressie had sent a copy of a shareholder agreement to Harlamert in 1988. Since that was long after the date upon which Harlamert acquired his

## B. Estoppel

■ Defendant argues in the alternative that Plaintiff is estopped from denying that Harlamert's shares were subject to a shareholder agreement, consistent with Defendant's Exhibit No. 1. In support of that proposition, Defendant relies upon cases decided by Delaware courts, holding that a party who takes advantage of a contract is estopped from denying that he is bound by it. For instance, in *SLMSoft. Com v. Cross Country Bank*, 2003 WL 1769770 (Del.Super.2003), the plaintiff brought an action for breach of contract. The defendant argued, *inter alia,* that the assignment of the contract by plaintiff's predecessor, without its consent, violated the anti-assignment provision of that agreement and constituted a material breach, thus relieving it of the obligation of continuing to perform under that contract. In rejecting the defendant's argument in that regard, the Delaware Superior Court noted that the defendant had continued to accept performance under that contract, long after it had been assigned, and held that the defendant, by its continued acceptance of performance, was estopped from claiming that the plaintiff, the assignee, could not recover under it. *Id.* at *11. In other words, the defendant was estopped from denying that it remained bound by the contract, notwithstanding the alleged breach of the anti-assignment provision. *Id.* This Court agrees with Defendant that Plaintiff would be estopped from denying that Harlamert is bound by such a shareholder agreement, *if* he had taken advantage of such agreements by receiving a

benefit under same. The Court's agreement on the legal predicate of the estoppel theory is of no ultimate benefit to Defendant, however, since there is simply no evidence that Harlamert ever took advantage of or received a benefit from any shareholder agreement.

## III. Conclusions of Law

■ 1. This Court can exercise subject matter jurisdiction over this matter in accordance with 28 U.S.C. § 1332, given that complete diversity exists between the parties. Plaintiff is a citizen of Ohio.[14] Defendant is a citizen of New Jersey, the state in which its principal place of business is located, and of Delaware, its state of incorporation.

2. The issue of whether Defendant can prevent Harlamert's estate from transferring his shares of WFF to Arlowe must be decided in accordance with the substantive law of Delaware.

3. In accordance with Delaware law, the type of shareholder agreement exemplified by Defendant's Exhibit No. 1 would have been enforceable, if Harlamert had executed such an agreement or had acquired his shares of V.I.P., with actual knowledge that such an agreement existed, or if Plaintiff were estopped from denying that such a shareholder agreement existed.

4. Plaintiff is entitled to prevail in this litigation, because the Court has found that Harlamert never executed any type of shareholder agreement with V.I.P., Reese or WFF, that he did not have actual knowledge on March 3, 1972, when he

shares of V.I.P., it does not demonstrate that he had acquired those shares with the requisite actual knowledge.

**14.** Plaintiff brings this litigation in his individual capacity and as Administrator of his father's estate. It bears emphasis that the citizenship of the representative of an estate,

such as an administrator, is controlling for diversity purposes, when the case is initiated by that representative. *Smith v. Sperling*, 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957); *Chappedelaine v. Dechenaux*, 4 Cranch (8 U.S.) 306, 2 L.Ed. 629 (1808) (per Marshall, C.J.).

purchased his shares of V.I.P., that there was in existence a type of shareholder agreement between that company and its shareholders, under which V.I.P. would have the right to redeem his shares on his death, and that Harlamert did not accept any benefits of such an agreement between V.I.P. Reese and/or WFF and their shareholders.

5. As a consequence, Plaintiff is entitled to a declaration that John Harlamert's estate can transfer the ten shares of V.I.P. stock that Harlamert had owned to Plaintiff.

Based upon the foregoing, the Court directs that judgment be entered in favor of Plaintiff and against Defendant, declaring that the estate of John Harlamert is permitted to transfer the ten shares of WFF which Harlamert had owned to Plaintiff in his individual capacity.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.