# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JON HENRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12504-VCMR |
| | ) | |
| PHIXIOS HOLDINGS, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

# OPINION

Date Submitted: April 10, 2017
Date Decided: July 10, 2017

Michael W. McDermott, BERGER HARRIS LLP, Wilmington, Delaware; *Attorney for Plaintiff*.

Carl D. Neff and E. Chaney Hall, FOX ROTHSCHILD LLP, Wilmington, Delaware; *Attorneys for Defendant*.

**MONTGOMERY-REEVES, Vice Chancellor.**

In this action, an alleged stockholder seeks books and records for the purpose of investigating mismanagement of the company, communicating with other stockholders, and valuing his shares. He points to the chief operating officer's own in-court admissions of using corporate funds for personal expenses and the company's precarious financial situation as a credible basis to infer mismanagement sufficient to establish a proper purpose under 8 *Del. C.* § 220.

The company has rebuffed all examination efforts because it alleges that the plaintiff is no longer a stockholder. According to the company, its initial three directors adopted bylaws that contain stock transfer restrictions, and all company stock certificates were issued after that time and are subject to those restrictions. Under the restrictions, stock may be revoked by a majority of all voting stockholders if a stockholder is found to be engaging in acts that are damaging to the company. The company admits that the stock transfer restrictions are not noted on the stock certificate. Instead, the company asserts that the stockholder plaintiff knew about these restrictions and consented to be bound before he obtained stock in the company. The chief operating officer (who is partially the subject of the investigation) purportedly explained the restrictions multiple times and provided the bylaws to the stockholder before he accepted stock in the company. Thereafter, she sent the bylaws again, and the stockholder acknowledged receipt. Thus, according to the company, the stockholder was bound by the restrictions. The company

2

contends that after the stock was issued, the stockholder engaged in efforts to compete with the company, and, in response, the company validly rescinded his stock under the bylaws. As such, the company claims he has no right to the documents except to value his shares.

The plaintiff stockholder responds that he did not have actual knowledge of the stock transfer restrictions before he acquired the stock and never assented to the restrictions after he acquired the stock, which is required under 8 *Del. C.* § 202. Through this action, the plaintiff stockholder requests that the Court: (1) declare that his stock is not subject to the restrictions and that he is still a stockholder of the company; (2) order the company to grant him access to all documents sought in his demand letter; and (3) award the plaintiff attorneys' fees.

I hold that under Section 202, in order for a stockholder to be bound by stock transfer restrictions that are not "noted conspicuously on the certificate or certificates representing the security," he must have actual knowledge of the restrictions before he acquires the stock. If the stockholder does not have actual knowledge of the stock transfer restrictions at the time he acquires the stock, he can become bound by the stock transfer restrictions after the acquisition of the stock only if he affirmatively assents to the restrictions, either by voting to approve the restrictions or by agreeing to the restrictions.

After a full trial, I find that the plaintiff stockholder did not have actual knowledge of the restrictions prior to acquiring his stock. Although the plaintiff stockholder may have received knowledge after he was granted stock, he did not assent to be bound by the restrictions. Therefore, the company could not rescind his stock under the bylaws, and he remains a stockholder of the company. As a valid stockholder, he is entitled to inspect the books and records of the company for any proper purpose. The stockholder has stated a proper purpose for inspection, and the company has failed to prove any of its defenses. Thus, the company must produce the requested documents as they are necessary to effectuate the stockholder's stated purpose. The plaintiff, however, is not entitled to attorneys' fees.

## I.    BACKGROUND

These are my findings of fact based on the parties' stipulations, documentary evidence, and the testimony of two witnesses during a half-day trial. I accord the evidence the weight and credibility I find it deserves.[1]

---

[1]    Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text. After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." This opinion refers to certain individuals by first name for clarity only. No disrespect is intended. Exhibits are cited as "JX #." Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.

## A. Parties and Relevant Non-Parties

Plaintiff Jon Henry became a stockholder of Phixios Holdings, Inc. in March 2015. Non-party Rhonda S. Henry is Jon Henry's wife. Non-party RSH Business Consulting Services ("RSH") is a consulting company owned by Rhonda.

Defendant Phixios Holdings, Inc. ("Phixios" or the "Company") is a Delaware corporation formed in July 2013 as a holding company to build product lines, make them successful, and sell them. Non-parties James Walker ("Walker"), Delbert Walker, and Michael Jacobson were the initial directors of Phixios. Walker is the Chief Executive Officer of Phixios. Non-party Jacobson was the Chief Information Officer during all relevant times. Non-party Penni Blake is the Chief Operating Officer of Phixios. Non-party Condor Monitoring, Inc. ("Condor") is a subsidiary of Phixios.

## B. Facts

### 1. The directors adopt bylaws that contain stock transfer restrictions

On July 18, 2013, the board of directors of Phixios, Walker, Delbert, and Jacobson, approved and executed the Phixios Holdings, Inc. Stockholder Agreement (the "Stockholder Agreement").[2] The purpose of the Stockholder Agreement was to

---

[2] JX 2. Walker, Delbert, and Jacobson also were stockholders. Blake testified that she, David Byars, Derek Walker, and Daniel Diaz were also stockholders at the time

"protect the company and everybody in it from somebody who would potentially do something that could be harmful" to the Company.[3]  The Stockholder Agreement provides, in relevant part:

> Stock maybe [sic] surrendered only by the registered owner except in the following circumstances:
> - A stockholder is found to be engaging in acts, or has previously engaged in acts, that are damaging to Phixios.  Examples include but are not limited to:
>   - Working for a competitor.
>   - Willfully disclosing proprietary information.
>   - Other willful acts that are harmful to Phixios as determined by a majority vote of the board of directors and all voting stockholders.
>
> In these circumstances, by a majority vote of all voting stockholders, the ownership of the stock will be revoked and returned to Phixios Treasury and may be redistributed.
> . . . Phixios will pay par value of the stock at the time of revocation to the registered stock holder.[4]

The Company did not retain legal counsel but rather Googled how to draft a stockholder agreement.[5]  Blake was advised by a "justanswer.com" lawyer "that the majority of the directors had to sign it and that this would be what every shareholder was bound by" so long as Phixios explained the agreement to each potential

---

the Stockholder Agreement was approved.  No stock certificates were issued until 2014.  Tr. 127, 130.

[3]     Tr. 129 (Blake).

[4]     JX 2, at 2.

[5]     Tr. 127 (Blake).

6

stockholder before stock in the Company was issued to that stockholder.[6]  Blake testified that Phixios had corporate controls in place to ensure every stockholder received an explanation.  The Company would e-mail the agreement to every potential stockholder, and Blake would explain each provision to each potential stockholder prior to the issuance of any stock certificate.[7]  The Company, however, did not require any written evidence of the potential stockholder's knowledge of or assent to the Stockholder Agreement because the Company "operated on trust."[8]

### 2.    The Company hires Henry and issues stock to him

In February 2015, Jacobson contacted Henry to see if he would consider becoming involved with Phixios.[9]  On February 27, 2015, Blake e-mailed Henry an employment offer.[10]  The offer stated, in relevant part:

> . . . understanding our limited funds right now, I'd like to propose the following:
> 1)    We will give you 50,000 shares of Phixios Holdings, Inc. stock immediately.
> 2)    Salary of $130,000 per year beginning day you start.

---

[6]    Blake Dep. 99-100; Tr. 197-98 (Blake).

[7]    Tr. 130-32, 196-98 (Blake).

[8]    *Id.* at 196-98.

[9]    Tr. 8 (Henry).

[10]    JX 5; Tr. 9 (Henry).

3) 30% yearly bonus (based on personal performance, company performance, and customer sat)

4) We can only pay you $1,000 per month right now until revenue is high enough to cover your full salary.

5) 100% of back pay will be paid as soon as we get to the revenue point to pay your full salary.

We understand we are asking for a fulltime commitment with a deferred salary. Hence, the 50,000 shares of stock.[11]

Henry accepted the offer and was "officially onboard" as of March 5, 2015.[12]

On March 25, 2015, Walker signed and issued Henry's stock certificate for 50,000 shares of Phixios.[13] The certificate does not contain or note any stock transfer restriction, and there is nothing in writing to show the restrictions were provided to Henry by March 25th. In a March 25, 2015 e-mail exchange titled "Stock Certificates," Blake provided Henry with a tracking number, and Henry responded, ". . . thanks for the discussion today, it made me feel much more comfortable with everything."[14] That e-mail does not attach or reference the Stockholder Agreement. In an affidavit submitted on September 6, 2016 in support of Phixios's opposition to

---

[11]     JX 5.

[12]     JX 6.

[13]     JX 9.

[14]     JX 10.

8

Henry's motion for summary judgment, Blake stated that the "discussion" referenced in Henry's e-mail was a telephone conversation in which she explained "each and every section of the Stockholder Agreement to Henry."[15] Blake testified at trial that she e-mailed Henry the Stockholder Agreement on the same day she sent the stock certificate.[16] Blake did not provide any credible explanation for why one e-mail exchange from March 25, 2015 could be produced but another exchange from the same day that purportedly attached the Stockholder Agreement could not be produced. She merely stated that the "e-mail has gone missing," presumably because she "switched computers."[17] No explanation was provided as to why "switch[ing] computers" would affect the availability of certain e-mails and not others.

Additionally, Blake's testimony regarding when and how many conversations occurred regarding the Stockholder Agreement changed throughout trial. Initially, there were two conversations between Blake and Henry before February 27, 2015.[18] One conversation was at a "high-level," and the other went through "every single

---

[15] JX 91.

[16] Tr. 140-41.

[17] Blake Aff. Ex. A; Tr. 199-200.

[18] Tr. 137.

9

paragraph."[19]  Blake testified that she specifically discussed the terms of the Stockholder Agreement, including the stock transfer restrictions, and that Henry said "he was fine, he was happy" and that "it sound[ed] good. He understood."[20]  Then Blake testified that there was a conversation on February 27, 2015 and another on March 25, 2015.[21]  Later Blake said she had at least three phone calls with Henry.[22]  Finally, Blake explained that she didn't "have the dates right in [her] mind," but there were "a bunch" of telephone conversations.[23]

Henry testified that he and Blake did not discuss the Stockholder Agreement before his employment offer.[24]  The purpose of their conversation was to address Henry's concern that Phixios had delayed the issuance of shares.

On August 10, 2015, Blake sent an e-mail titled "Stockholder Agreement" to multiple Phixios stockholders attaching the Stockholder Agreement.[25]  Blake wrote, "I think everyone already has this, but just sending again as I'm trying to get

---

[19]     *Id.* at 136-38.

[20]     *Id.* at 139-40.

[21]     *Id.* at 187.

[22]     *Id.* at 190.

[23]     *Id.* at 192-93, 199.

[24]     *Id.* at 20-21.

[25]     JX 13.

everything in order with documentation and such to get ready for growth."[26]  Henry responded, "Thank you for getting a copy out for my records" and forwarded the e-mail to his wife, Rhonda.[27]  Henry testified at trial that he did not look at the Stockholder Agreement when he received it but rather sent it to his wife to print a copy and put it with their "important paperwork."[28]  He thought this document was a "set of instructions" that would tell him what day Phixios stockholders had the ability to tender their stock if they wanted to and how to go about tendering if the occasion ever came up.[29]

### 3. Business begins to suffer and the Company explores further opportunities

By the end of 2015, things at the Company were "slowing down significantly," and there "weren't nearly as many prospects."[30]  To deal with these concerns, Walker and Jacobson discussed alternatives to increase the business's lagging revenue.[31]  Henry testified that Walker asked Jacobson to explore the Federal

---

[26]     *Id.*

[27]     *Id.*; JX 14; Tr. 48.

[28]     Tr. 22.

[29]     *Id.* at 22-23.

[30]     *Id.* at 26.

[31]     *Id.*

11

Business Opportunities ("FBO") process and to use Henry's services for the "documentation of those processes."[32] That testimony is corroborated by a January 2016 e-mail exchange between Henry, Jacobson, and Walker, in which Henry stated to Jacobson: "Based upon the brief text message you sent me last weekend you've asked me to look into and define to [sic] new processes that would allow us to take advantage of Contract Proposals (RFP's) issued by the Federal Government."[33] The e-mail further stated: "After some research and direct communications, I've put together a process."[34] Jacobson responded by stating, in part:

> Jon & James
>
> FBO website needs to be utilized until I can figure when/if paying for the actual gov contract web site is a more viable option. Concur?
>
> James
>
> That said why is [sic] Phixios representatives unable to login to FBO and is this going to be rectified?[35]

---

[32]     *Id.* at 27.

[33]     JX 24.

[34]     *Id.*

[35]     *Id.*

On March 10, 2016, Rhonda registered an account for RSH with the FBO Vendor System, and Henry e-mailed Jacobson the information.[36] Henry testified that this registration was necessary in order to obtain an FBO access ID.[37] Henry never attempted to register Phixios through the FBO, and to his knowledge, neither did Jacobson.[38]

After completing the FBO registration process, throughout March and April, RSH began to receive numerous requests for proposals and requests for quotations for various contracts.[39] Henry and Jacobson communicated through their Phixios e-mail accounts, considered many of these solicitations, and worked to document the processes that would be required to pursue these opportunities.[40] Phixios points to several exchanges in particular that it believes evidence RSH's, and thus Henry's, competition with the Company. For example, on March 31, 2016, Jacobson e-mailed Henry about a potential FBO opportunity and told Henry: "So I figure it is something you should check out or we should look into together . . . You know turn

---

[36] JX 43; JX 44.

[37] Tr. 68-71.

[38] Tr. 83-84.

[39] JX 46; JX 47; JX 53; JX 60; JX 62; JX 65; JX 68; JX 69; JX 73; JX 74.

[40] JX 46; JX 47; JX 53; JX 60; JX 62; JX 65; JX 68; JX 69; JX 73; JX 74.

the other check[.] [sic]"[41]    Additionally, in response to a discussion regarding a

government on-boarding call, Henry told Jacobson:

> We need to keep in mind that the business is registered as a Sole Proprietorship owned by a women. [sic] If you and I attempt to make the call without my wife being on the line, it could quickly go against us. We might need to do the on boarding call with her present in the event they expect to speak to the owner?[42]

In an e-mail chain titled "NASA Mentor Protégé Program," Jacobson tells Henry to

call him about this NASA opportunity.  An attachment highlights the requirement

that a protégé "must meet one of the eligibility requirements," and the attachment

highlights the "Woman-Owned Small Businesses (WOSBs)" category.[43]    Henry

testified that Phixios did not qualify as a woman-owned small business or any of the

additional categories mentioned in the attachment.  This meant Phixios would not

have been able to receive "preferential points to awardment of a contract

potentially."[44]   Henry testified at trial that he was using RSH to explore potential

revenue sources and opportunities for Phixios and reporting his findings back to

---

[41]    JX 46.

[42]    JX 69.

[43]    JX 73; JX 74.

[44]    Tr. 95-96.

Jacobson. Ultimately, because the Company was so overwhelmed in other areas, Phixios did not pursue any of these potential contracts.

### 4. Conflicts with Blake surface

On January 28, 2016, Walker sent an e-mail to Jacobson attaching 60 days of Wells Fargo Bank statements stating, "As you can see I need to have a talk with Penni."[45] The attached statements included various seemingly personal purchases, such as iTunes and Target transactions. Blake reviewed these communications at trial and confirmed that they related to her. She testified at trial that she was "a signer on the account," and she "got to decide how money was spent and when it was spent."[46] She explained that because finances were tight, she did not take her full salary and used the debit card when she "had to buy something or pay something."[47] She paid herself "$6,000 less that year" and "1099'd" herself for everything she spent.[48] She testified that during a discussion about this behavior Walker said, "Your heart was in the right place, but that was really dumb, so don't

---

[45]    JX 26.

[46]    Tr. 160.

[47]    *Id.* at 160-61.

[48]    *Id.* at 161.

do it again."[49]  Walker also told her that if she did it again, he would have to fire her.[50]  Blake further testified that Walker made her "do a full accounting of all the money that was spent against all the bank accounts and show him" in the March-April 2016 timeframe.[51]

## 5.  Henry is fired and the litigation begins

On May 6, 2016, Walker sent Henry an e-mail stating, in part:

> Jon, I tried to reach you this morning to discuss a layoff. Effective immediately.  As a company we can no longer financially support outside contractors.  If the company sells or starts making money you will receive what is owed to you.[52]

Henry replied that he had "stopped billing [Phixios] as of April 1st since things had slowed down due to the cut backs in available revenue.  This blocked our ability to purchase any parts needed to test, build or deliver anything to sales or the customer base."[53]  He also stated that he understood the situation and thanked Walker for the opportunity to work with him for the past year.[54]  Henry testified that he went back

---

[49]  *Id.*

[50]  *Id.*

[51]  *Id.* at 162-63.

[52]  JX 75.

[53]  *Id.*

[54]  *Id.*

to being retired after he left Phixios.[55] On October 14, 2016, Blake submitted an affidavit in support of Phixios's opposition to Henry's motion to quash and stated her understanding that "Henry, through RSH, is continuing to compete with Phixios now."[56] At trial, she admitted that her belief was based solely on a conversation with Chuck Nash, a person with whom Phixios suspected Henry and Jacobson were continuing to do business.[57] Blake has no first-hand basis for believing that Henry continues to compete with the Company and no proof to support the statement in her affidavit.[58]

In June 2016, Henry, Rhonda, and Jacobson received a cease-and-desist letter from counsel representing Phixios.[59] The letter addressed to Henry alleged that he was "conspiring with Mr. Jacobson to defraud the Company and misappropriate Company assets for [his] own personal gain."[60] On June 8, 2016, Jacobson delivered a Section 220(d) demand to the Company requesting inspection of certain books and

---

[55]  Tr. 31-32.

[56]  JX 93; Tr. 218-22.

[57]  Tr. 218-20.

[58]  *Id.*

[59]  JX 76; JX 77.

[60]  JX 76.

17

records.[61]  On June 19, 2016, the Company sent notice to stockholders of a special meeting to be held June 30, 2016.[62]  On June 21, 2016, Henry sent a request under Section 219 to examine the list of the Company's stockholders entitled to vote at the special meeting.[63]

On June 23, 2016, Henry and Jacobson delivered a written demand (the "Demand Letter") to the Company requesting that the Company allow Jacobson and Henry "to examine a list of the Company stockholders in connection with a special meeting the [C]ompany has purportedly noticed to take place on June 30, 2016" pursuant to Section 219.[64]  The Demand Letter also seeks the inspection of books and records "(i) to communicate with other stockholders concerning the June 30 special meeting; (ii) to value their stock; and (iii) to investigate mismanagement and wrongdoing" pursuant to Section 220(b).[65]  The Demand Letter asks for the following specific documents:

- All executed stockholder agreements, any amendments thereto, and any current capitalization table, and the stockholder list described above;

---

[61]  Joint Pre-Trial Stipulation 24.

[62]  *Id.*

[63]  *Id.*

[64]  JX 79, at 1.

[65]  Joint Pre-Trial Stipulation 24; JX 79, at 3.

18

- Annual, quarterly and monthly financial statements, including both audited and internally-prepared income statements, balance sheets, cash flows and stockholders' equity statements, from the Company's 2013 inception through the present;
- Federal, state and local income tax returns and reports together with supporting documentation;
- General ledger, check registry and related journal entries for the years 2013 to the present;
- Schedule of current Company debt;
- Schedule of compensation paid to the officers, managers and board of directors;
- Payroll records from July 2013 to present;
- Bank statements from July 2013 through the present for all Company bank accounts;
- Documents constituting budgets, projections, or business plans; and
- Documents relating to any actual, potential or contemplated transaction resulting in a merger or other business combination, or the sale of the Company's assets.[66]

On June 30, 2016, the Company held a special meeting of the stockholders and voted to remove Jacobson as a director.[67] On July 12, 2016, the Company held another special meeting of the stockholders and purported to revoke all of the common stock held by Henry and Jacobson under Section 11 of the Stockholder

---

[66] JX 79, at 2-3. In connection with post-trial briefing, Henry narrowed his request to documents from March 2015 through the present. Pl.'s Reply Br. 12-14.

[67] Joint Pre-Trial Stipulation 25, 28.

Agreement.[68]  Henry testified that he never received notice of the July 12, 2016 meeting.[69]  In a letter dated July 19, 2016, Phixios notified Henry and Jacobson that their common stock had been revoked on July 12, 2016.[70]  On July 22, 2016, Henry was added as a plaintiff to this action.[71]

## II.  ANALYSIS OF THE STOCK TRANSFER RESTRICTIONS

In this case, the Company alleges that the Stockholder Agreement was adopted as part of the bylaws of the Company long before Henry was issued stock in the Company.  The Company further maintains that although the restrictions were not noted conspicuously on the stock certificate representing Henry's stock, Henry had actual knowledge both before and after the shares were issued, either of which is adequate under 8 *Del. C.* § 202(a).  Henry concedes that the Stockholder Agreement was in place before Henry's stock was issued.  But he contends that the provisions contained in the Stockholder Agreement are not bylaws of the Company.  Even accepting as true that the provisions in the Stockholder Agreement are bylaws, Henry argues that he is not bound under Section 202 because he did not have actual

---

[68]  *Id.*

[69]  Tr. 37.

[70]  Joint Pre-Trial Stipulation 25.

[71]  *Id.*

knowledge of the restrictions before the stock was issued, and he did not consent to be bound after the stock was issued.

I need not decide whether the provisions in the Stockholder Agreement constituted bylaws because whether the restrictions were adopted through bylaws, through an agreement, or otherwise does not change the analysis. Instead, I must determine whether Henry had actual knowledge by the time the stock was issued. If the answer is no, I must also determine whether under Section 202 Henry may be bound by restrictions that were in place before the securities were issued to him if he gained actual knowledge of the restrictions after the securities were issued to him. If the answer to that question is no, I must determine whether Henry otherwise consented to be bound by a subsequent agreement or vote in favor of the restrictions.

In order to obtain a declaratory judgment, the plaintiff bears the burden of proving each element of his claim by a preponderance of the evidence.[72]  "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the

---

[72]    *Prizm Gp., Inc. v. Anderson*, 2010 WL 1850792, at *4 (Del. Ch. May 10, 2010).

21

more convincing force and makes you believe that something is more likely true than not."[73]

## A. Principles of Statutory Interpretation

Under Delaware law, "a statute or an ordinance is to be interpreted according to its plain and ordinary meaning."[74] "Where a statute contains unambiguous language that clearly reflects the intent of the legislature, then the language of the statute controls."[75] Delaware courts "construe statutes 'to give a sensible and practical meaning to a statute as a whole in order that it may be applied in future cases without difficulty.'"[76] The courts also "read each relevant section of the statute in light of all the others to produce a harmonious whole."[77] "Words in a statute should not be construed as surplusage if there is a reasonable construction which

---

[73] *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at \*13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at \*17 (Del. Ch. Oct. 23, 2002)) (internal quotation marks omitted).

[74] *New Cingular Wireless PCS v. Sussex County Bd. of Adjustment*, 65 A.3d 607, 611 (Del. 2013).

[75] *State Farm Mut. Auto. Ins. Co. v. Kelty*, 126 A.3d 631, 635 (Del. 2015) (quoting *Hoover v. State*, 958 A.2d 816, 820 (Del. 2008)) (internal quotation marks omitted).

[76] *Rapposelli v. State Farm Mut. Auto. Ins. Co.*, 988 A.2d 425, 427 (Del. 2010) (quoting *Nationwide Mut. Ins. Co. v. Krongold*, 318 A.2d 606, 609 (Del. 1974)).

[77] *Kelty*, 126 A.3d at 635 (quoting *Progressive N. Ins. Co. v. Mohr*, 47 A.3d 492, 496 (Del. 2012)).

will give them meaning, and the courts must ascribe a purpose to the use of statutory language, if reasonably possible."[78]

### B. Knowledge and Consent Requirements Under Section 202

Section 202(a) of the Delaware General Corporation Law provides:

> A written restriction or restrictions on the transfer or registration of transfer of a security of a corporation . . . if permitted by this section and noted conspicuously on the certificate or certificates representing the security or securities so restricted . . . may be enforced against the holder of the restricted security or securities or any successor or transferee of the holder. Unless noted conspicuously on the certificate or certificates representing the security or securities so restricted . . . a restriction, even though permitted by this section, is ineffective except against a person with actual knowledge of the restriction.[79]

Thus, a written restriction on the transfer of a security may be enforceable against a particular stockholder if: (1) it is noted conspicuously on the certificate representing the security in the case of certificated shares; or (2) the person against whom enforcement is sought had actual knowledge of the restriction.

Section 202(b) states:

> A restriction on the transfer or registration of transfer of securities of a corporation . . . may be imposed by the certificate of incorporation or by the bylaws or by an

---

[78] *Cingular*, 65 A.3d at 611 (quoting *Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994)) (internal quotation marks omitted).

[79] 8 *Del. C.* § 202(a).

agreement among any number of security holders or among such holders and the corporation. No restrictions so imposed shall be binding with respect to securities issued prior to the adoption of the restriction unless the holders of the securities are parties to an agreement or voted in favor of the restriction.[80]

Therefore, a stock transfer restriction may be binding on existing securities through one of three ways: (1) by inclusion in the certificate of incorporation; (2) by inclusion in the bylaws of the corporation; or (3) by agreement among stockholders or among stockholders and the corporation. An existing stockholder must affirmatively assent to the restriction in order to be bound either by becoming a party to an agreement or by voting in favor of the restriction.[81] A restriction cannot be retroactively imposed on a current stockholder without his express consent.

"The purpose of § 202 is to protect a shareholder's investment from diminishment through post-purchase restrictions placed on the shareholder's shares by the corporation or its other shareholders."[82] "Otherwise, others might

---

[80]     *Id.* § 202(b).

[81]     *Id.*; *see Joseph E. Seagram & Sons, Inc. v. Conoco, Inc.*, 519 F. Supp. 506, 513-14 & nn.4-5 (D. Del. 1981); EDWARD P. WELCH ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 202.06, at 6-20 (6th ed. 2016); R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, DELAWARE LAW OF CORPORATIONS & BUSINESS ORGANIZATIONS § 6.6, at 6-10 (3rd ed. 2013); FOLK, THE DELAWARE GENERAL CORPORATION LAW: A COMMENTARY AND ANALYSIS 197-98 (1972).

[82]     *Di Loreto v. Tiber Hldg. Corp.*, 1999 WL 1261450, at *6 (Del. Ch. Jun. 29, 1999).

circumscribe the stockholder's ability to transfer his or her shares, reducing the investment's liquidity and value."[83]  The phrasing in Section 202 was modeled after Section 8-204 of the Uniform Commercial Code,[84] to which the official comments state, "A purchaser who takes delivery of a certificated security is entitled to rely on the terms stated on the certificate."[85]  Section 202(a) thus is intended to provide notice such that encumbered securities are easily identified.[86]  A stockholder who bargains for a security is entitled to use the certificate's terms as evidence of his economic rights and as proof of the value he bargained for.

Reading the statute holistically to give it its intended purpose, the statute must be read to mean that an existing restriction on the transfer of a security is binding on *subsequent* purchasers of the securities if:  (1) it is noted conspicuously on the certificate representing the security; (2) the stockholder has actual knowledge of the restriction *at the time he acquires the stock*; or (3) the stockholder consents to be bound by the restriction either through a vote or through a subsequent agreement

---

[83]    *Id.*

[84]    WELCH ET AL., *supra* note 81, § 202.06, at 6-19; FOLK, *supra* note 81.

[85]    UCC § 8-204.

[86]    BALOTTI & FINKELSTEIN, *supra* note 81 § 6.6, at 6-9 to 6-10.

with the stockholders or with the company.[87] To allow otherwise would "produce the incongruous result of allowing the Board of Directors [or other stockholders] unilaterally to impose stock transfer restrictions, which might be of significant economic consequence, on existing shares without the [knowledge before purchase or] consent [after purchase] of the corporation's stockholders."[88]

Taken to its logical conclusion, the Company's position would allow it to entice an investor into purchasing securities with the expectation that transfer is unrestricted because no restrictions are noted on the certificate representing the securities, while withholding the existence of potentially value-reducing restrictions. "[T]he Legislature could not have intended to produce such onerous results."[89] This absurd result would completely undercut the purpose of Section 202 to protect the stockholder's bargained-for rights.

### 1. Henry did not have actual knowledge of the restrictions when he received Company stock

Phixios argues that Henry had actual knowledge of the restrictions before stock was issued to him because Blake discussed the Stockholder Agreement with

---

[87] 8 *Del. C.* § 202(a); *see also Agranoff v. Miller*, 1999 WL 219650, at *12 (Del. Ch. Apr. 12, 1999); *Joseph E. Seagram & Sons, Inc. v. Conoco, Inc.*, 519 F. Supp. 506, 513-14 (D. Del. 1981); BALOTTI & FINKELSTEIN, *supra* note 81, § 6.6, at 6-10.

[88] *Seagram*, 519 F. Supp. at 513.

[89] *Id.* at 514.

Henry before issuing his stock and sent him the Stockholder Agreement on March 25, 2015 (the day she issued the stock). Blake's testimony that she explained each provision to Henry and sent him the Stockholder Agreement prior to the issuance of stock is dubious at best.[90] She claims in her September 7, 2016 affidavit that she discussed the Stockholder Agreement with Henry and sent him the agreement on March 25, 2015.[91] The affidavit does not mention any conversation occurring before March 25, 2015. At trial, however, she contradicted her own sworn affidavit.[92] She stated she had multiple conversations with Henry regarding the Stockholder Agreement. She testified that she could not remember the exact dates of these conversations, but she also testified that she had a phone call about the Stockholder Agreement prior to February 27, 2015, on February 27, 2015, and on March 25, 2015.[93] Her only explanation for why these additional conversations were not included in her affidavit is that she "didn't author this document," but merely "approved" it.[94] Finally, although Blake testified at trial that she e-mailed Henry the

---

90      *See supra* Section I.B.2.

91      JX 91.

92      Tr. 136-38.

93      *Id.* at 190-92.

94      *Id.* at 192.

Stockholder Agreement on the same day she sent the stock certificate,[95] she did not provide any credible explanation for why the purported e-mail containing the agreement could not be produced when other e-mails from the same day were produced. And she did not produce any documentation showing that she sent the Stockholder Agreement to Henry prior to March 2015.[96] Thus, Phixios offers nothing to rebut Henry's credible testimony that he did not have actual knowledge of the restrictions when he became a stockholder in March 2015.

### 2. Henry did not assent to the stock transfer restrictions

Both sides acknowledge that the Stockholder Agreement was sent to Henry on August 10, 2015.[97] Even assuming, *arguendo*, that after this date Henry had actual knowledge of the Stockholder Agreement, as discussed above, to impose transfer restrictions on a stockholder who did not have actual knowledge of those restrictions when he became a stockholder and who did not affirmatively assent to the restrictions after he became a stockholder would run afoul of the legislative

---

[95]      *Id.* at 140-41.

[96]      *Id.* at 199-200.

[97]      JX 13; Pl.'s Opening Br. 11; Def.'s Answering Br. 9.

purpose of Section 202.[98] Thus, the question becomes whether Henry affirmatively assented or became a party to a subsequent agreement containing these restrictions.[99]

"The use of the internet as the vehicle for contract formation 'has not fundamentally changed the principles of contract.'"[100] "The 'threshold issue is the same: did the party who assented online have reasonable notice, either actual or constructive, of the terms of the putative agreement and did that party manifest

---

[98] *See Di Loreto v. Tiber Hldg. Corp.*, 1999 WL 1261450, at *6 (Del. Ch. Jun. 29, 1999); *Joseph E. Seagram & Sons, Inc. v. Conoco, Inc.*, 519 F. Supp. 506, 513-14 (D. Del. 1981); *Harlamert v. World Finer Foods, Inc.*, 494 F. Supp. 2d 681, 687 (S.D. Ohio 2006) ("As can be seen, a restriction on the transferability of shares of stock is permissible under Delaware law, if the shareholder agrees to such a restriction or has actual knowledge of the restriction when the securities are issued to him."); UCC § 8-204; WELCH ET AL., *supra* note 81, § 202.06, at 6-19.

[99] Phixios points to *Agranoff v. Miller* where the Court held that a restriction on stock was valid, even where not noted on the stock certificate, because the stockholder had actual knowledge of the restriction. 1999 WL 219650, at *12-13 (Del. Ch. Apr. 12, 1999); Def.'s Answering Br. 20-22. In *Agranoff*, then-Vice Chancellor Strine found that the stockholder had actual knowledge of the restriction years before he acquired the stock. 1999 WL 219650, at *12. There, the stockholder "purposely refrained from obtaining a copy" of the pertinent agreement until after he purchased some of the stock. But, his agents had a copy of the pertinent agreement prior to his purchase of any shares, and he received a copy of the agreement prior to his further purchase of a majority stake in the company. *Id.* at *12 & n.14. No such facts exist here. Henry did not receive or have knowledge of the agreement prior to his purchase. There are no credible allegations that he was purposely avoiding knowledge of the restrictions. And there are no allegations that he purchased more shares after he knew of the restrictions.

[100] *Newell Rubbermaid v. Storm*, 2014 WL 1266827, at *6 (Del. Ch. Mar. 27, 2014) (quoting *Van Tassell v. United Mktg. Gp., LLC*, 795 F. Supp. 2d. 770, 790 (N.D. Ill. 2011)).

assent to those terms.'"[101]  "A party may assent to an agreement on the internet [or through email] without reading its terms and still be bound by it if she is on notice that she is modifying her legal rights, just as she may with a physical written contract."[102]

On August 10, 2015, Blake sent an e-mail titled "Stockholder Agreement," and wrote "I think everyone already has this, but just sending again as I'm trying to get everything in order with documentation."[103]  Henry responded, "Thank you for getting a copy out for my records."[104]  The *Newell Rubbermaid Inc. v. Storm*[105] case provides an example of the type of language that gives adequate notice of the modification of legal rights.  There, the Court held that a clickwrap agreement modifying an employee's post-employment rights was enforceable because the defendant had to affirmatively click a box next to a bolded, conspicuous sentence stating that she "read and agree[d] to the terms of the" agreement.[106]  She also had

---

[101]  *Id.* (quoting *Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d. 1135, 1149 (D. Colo. 2012)).

[102]  *Id.* at *7.

[103]  JX 13.

[104]  *Id.*

[105]  *Newell Rubbermaid*, 2014 WL 1266827, at *6-7.

[106]  *Id.*

to affirmatively assent on an additional screen with an "Accept" button that stated in order to complete the agreement, she must "read and accept the terms outlined in the document" and that her "grant acceptance will be final once [she] click[ed] Accept."[107] Although the precise language in *Newell Rubbermaid* is not mandatory to manifest assent, there is no evidence that Henry was on notice that he was modifying his legal rights when he acknowledged receipt of the August 10, 2015 e-mail. To the contrary, Henry credibly testified at trial that he did not open the attachment because he thought it was a set of instructions describing how Phixios stockholders could tender their stock.[108] Phixios does not provide any credible evidence to the contrary. Therefore, Henry did not assent to be bound by the stock transfer restrictions contained in the Stockholder Agreement; his stock was revoked invalidly; and Henry remains a stockholder of Phixios.[109]

---

[107] *Id.*

[108] Tr. 22-23.

[109] Phixios argues that Henry acquiesced to the terms of the Stockholder Agreement or, in the alternative, is equitably estopped from denying the restrictions contained therein. Def.'s Answering Br. 24-29. In support of its arguments, Phixios cites Henry's reply to the August 10, 2015 e-mail attaching the Stockholder Agreement saying "Thank you for getting a copy out for my records." JX 13. Acquiescence requires that a plaintiff "has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; *or* (2) freely does what amounts to recognition of the complained act; *or* (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved." *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *20 (Del. Ch. Oct. 11, 2013) (quoting *NTC Gp., Inc. v. West-Point Pepperell, Inc.*, 1990 WL

31

## III. ANALYSIS OF THE BOOKS AND RECORDS CLAIM

A stockholder of a Delaware corporation may inspect the corporation's books and records under Section 220 for any proper purpose. "A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder,"[110] and "a stockholder has the burden of proof to demonstrate a proper purpose by a preponderance of the evidence."[111] A stockholder who seeks inspection of books or records in order to investigate wrongdoing also must state "a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation—a showing that 'may ultimately fall well short of demonstrating that anything wrong occurred.'"[112] A plaintiff seeking inspection

143842, at *5 (Del. Ch. Sept. 26, 1990)). Estoppel requires that a "party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." *Wilson v. Am. Ins. Co.*, 209 A.2d 902, 903-04 (Del. 1965). "To establish an estoppel, it must appear that the party claiming the estoppel lacked knowledge and the means of knowledge of the truth of the facts in question, that he relied on the conduct of the party against whom the estoppel is claimed, and that he suffered a prejudicial change of position in consequence thereof." *Id.* at 904. But Phixios fails to prove that it was misled or changed its position in any way in reliance on Henry's acknowledgement of receipt of the attachment. And Phixios has put forth no other evidence to prove acquiescence or estoppel.

[110] 8 *Del. C.* § 220.

[111] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006).

[112] *Id.* at 123 (quoting *Khanna v. Covad Commc'ns Gp., Inc.*, 2004 WL 187274, at *6 n.25 (Del. Ch. Jan. 23, 2004)).

must also prove that "each category of the books and records requested is essential and sufficient to the party's stated purpose."[113]  "The plaintiff can obtain books and records that 'address the crux of the shareholder's purpose and if that information is unavailable from another source.'"[114]  And, this Court "may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other or further relief as the Court may deem just and proper."[115]

Henry's Demand Letter states that his purposes are to (1) communicate with other stockholders regarding the June 30 meeting; (2) value his shares; and (3) investigate mismanagement.[116]  All three are proper purposes under Section 220, and Phixios does not argue otherwise.

Instead, Phixios argues that: (1) Henry's true purpose is not to value his shares but to retaliate against the Company and to further his competitive scheme against the Company; (2) the inspection demand as it relates to the valuation of shares should be appropriately tailored; (3) Henry has failed to provide a credible basis for

---

[113]   *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996).

[114]   *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 788 (Del. Ch. 2016) (quoting *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1271 (Del. 2014)).

[115]   *Id.* at 796 (quoting 8 *Del. C.* § 220(c)).

[116]   JX 79.

investigating mismanagement and wrongdoing; and (4) the purpose for the stockholder list has been mooted because the June 30, 2016 meeting has come and gone.

## A. Henry Has Alleged a Proper Purpose

Phixios contends that Henry's primary purpose is to compete with the Company through RSH and to aid and abet Jacobson in his breaches of fiduciary duties. As evidence of this, Phixios argues that Henry never requested access to financial records of the Company before making the demand, and he seeks to know the value of his shares for estate planning purposes, not to sell or buy more shares.[117] But Henry never stated in the Demand Letter or in this litigation that he did not want to value his stock to decide whether to sell.[118] And, more importantly, Phixios has not provided any reason why Henry's valuation of his shares for estate planning purposes would be improper.

Phixios also has not shown that Henry is competing or plans to compete with Phixios. Phixios points to e-mail exchanges regarding the FBO account registered to RSH as evidence of Henry's competition with the Company. Phixios argues that Henry created the account for RSH's benefit and solicitation of FBO opportunities.

---

[117]    Def.'s Answering Br. 31-32.

[118]    *Id.* at 53-54.

34

Phixios contends that if Henry was working on behalf of Phixios he would have created a new FBO account for Phixios or fixed Phixios's existing account, which he did not do. Also, Phixios points to Henry's and Jacobson's e-mail correspondence considering FBO opportunities of which Phixios would not be able to take advantage. The most damning e-mails refer to certain requests for proposals that require the company to be a woman-owned business.[119] These e-mails prove improper competition, according to Phixios, because Phixios did not fit into this category, and it would not be able to take advantage of an opportunity limited to woman-owned businesses, while RSH could. Although I recognize the reality that Phixios could not take advantage of certain of the opportunities explored by Henry and Jacobson, Henry credibly testified that Walker set the mandate and knew about the plan to explore the FBO process.[120] Walker also knew about the problems with Phixios's FBO account. Henry credibly testified that he and Jacobson were identifying potential sources of revenue for Phixios. And Walker was aware that Henry was reporting to Jacobson, the Chief Information Officer of the Company, regarding the documentation of these processes for the future. Phixios did not bring Walker to trial to refute any of Henry's statements.

---

[119] JX 69; JX 73; JX 74.

[120] Tr. 26-27.

Further, these exchanges stopped before May 6, 2016 (Henry's termination date), which comports with Henry's testimony that the exploration of the FBO process was all done for the benefit of Phixios. This also confirms Henry's testimony that after leaving the Company, he retired and is currently not working. And the record contains no reliable evidence of any current plans to compete, much less actual competition. Although Blake stated in her October 14, 2016 affidavit that Henry is continuing to compete with Phixios, at trial she testified that she in fact had no knowledge of RSH's dealings after Henry and Jacobson left in May 2016.[121] Therefore, any argument that Henry seeks to compete with Phixios is unsubstantiated, as Phixios has not proven any scheme, conspiracy, or competitive conduct by Henry. And Phixios concedes, as it must, that communicating with other stockholders, valuing shares, and investigating mismanagement each states a proper purpose for inspection.

## B. Henry Has Stated a Credible Basis to Infer Wrongdoing

Phixios argues that Henry has not shown a credible basis to infer mismanagement or wrongdoing because (1) a lack of liquidity does not form a credible basis for mismanagement, and (2) Blake's use of the company credit card for personal expenses did not harm the Company and the issue was resolved. The

---

[121]    *Id.* at 217; JX 93.

"credible basis" standard "sets the lowest possible burden of proof."[122]  To state a credible basis to support investigation of possible mismanagement, the stockholder must show "some evidence" from which the "Court of Chancery can infer there is possible mismanagement that would warrant further investigation."[123]  This "threshold may be satisfied by a credible showing, through documents, logic, testimony, or otherwise, that there are legitimate issues of wrongdoing."[124]

Henry testified that Phixios had insufficient funds to purchase "inexpensive components needed to do some of the development and prototyping work that Mr. Jacboson was doing," and his requests for such items were never satisfied.[125] Furthermore, he testified that he "had seen text messages, e-mails, and an assortment of other documentation specifically showing that there were expenditures taking place that had nothing to do with business, and they were far outside the realm of anything that should have had anything to do with the business."[126]  At trial, Blake admitted that, because Phixios's finances were tight, she would "take some

---

[122]   *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 123 (Del. 2006).

[123]   *Id.*

[124]   *Id.* (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997)) (internal quotation marks omitted).

[125]   Tr. 38-39.

[126]   *Id.* at 39.

variation" of her full pay by using "the debit card out of the bank account when I had to buy something or pay something."[127]  These purchases included iTunes purchases, Target purchases, home furnishing purchases, and various restaurant transactions, to name a few.[128]  She and Walker discussed this conduct, and by her own admission, Walker told her "that was really dumb, so don't do it again."[129] Walker also warned that if she engaged in this type of behavior again, "he would have to let [her] go because he was telling [her] not to do it."[130]  Blake claims she "1099'd herself" for everything she spent.[131]  These allegations are sufficient to establish a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation.

### C.    Henry Is Entitled to the Documents He Seeks

Phixios argues that Henry's inspection demand should be appropriately tailored and not used to give access to overly broad categories of documents.  I agree. "A stockholder who states a proper purpose for inspection is entitled to inspect only

---

[127]    *Id.* at 160.

[128]    JX 26.

[129]    Tr. 161.

[130]    *Id.*

[131]    *Id.*

those records that are 'essential and sufficient' to achieve his purpose."[132]   A

document is "essential" if "it addresses the crux of the shareholder's purpose," and

the 'information the document contains is unavailable from another source.'"[133]

"[A] stockholder seeking to inspect books and records must specifically and

discretely identify, with 'rifled precision,' the documents sought."[134]

Phixios points to the *Bizzari v. Suburban Waste Services, Inc.* case, where

Judge LeGrow, sitting by designation as a Vice Chancellor, ruled that financial

statements, tax returns, and certain agreements encumbering the company's assets

were necessary and essential for the purpose of valuing his stock in two

companies.[135]   But Judge LeGrow also ruled that Bizzari did not prove how the

remaining requests for compensation paid to employees, monthly cash flow

statements, sales and expenses, credit, security, and pledge agreements would "aid

in valuing his interests beyond the aggregate information" contained in the financial

---

[132] *Bizzari v. Suburban Waste Servs., Inc.*, 2016 WL 4540292, at *7 (Del. Ch. Aug. 30, 2016) (quoting *Macklowe v. Planet Hollywood, Inc.*, 1994 WL 560804, at *6 (Del. Ch. Sept. 29, 1994)).

[133] *Bizzari*, 2016 WL 4540292, at *7 (quoting *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371-72 (Del. 2011)).

[134] *Id.* (quoting *Sec. First Corp. v. U.S. Die Casting and Dev. Co.*, 687 A.2d 563, 570 (Del. 1997)).

[135] *Id.*

statements.[136]  Importantly, Judge LeGrow found that Bizzari had ulterior motives, including competing directly with the company, which are not present here, and Bizzari did not adequately allege a proper purpose of investigating mismanagement.[137]

Here, Henry may only need the financial statements and tax information to value the Company; but, Henry has adequately alleged a credible basis for investigating mismanagement, and the other documents are essential to this purpose. Blake is the Chief Operating Officer of the Company who testified that she was a signer on the Company accounts, and she "got to decide how money was spent and when it was spent."[138]  She also admitted that she used Company funds to pay her personal expenses.[139]

Henry's request for check ledgers, a schedule of compensation paid to officers, managers and board of directors, payroll records, and bank statements are necessary to properly investigate Blake's mismanagement.  Henry is entitled to all the documents he seeks through this litigation.

---

[136]    *Id.* at *7-8.

[137]    *Id.* at *5-6.

[138]    Tr. 160.

[139]    *Id.*

**D. Henry is Not Entitled to Have the Court Void the Results of the June 30, 2016 Stockholder Meeting**

Under Section 219(a):

> The officer who has charge of the stock ledger of a corporation shall prepare and make, at least 10 days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting . . . . Such list shall be open to the examination of any stockholder for any purpose germane to the meeting for a period of at least 10 days prior to the meeting . . . .[140]

Section 219(b) states:

> If the corporation, or an officer or agent thereof, refuses to permit examination of the list by a stockholder, such stockholder may apply to the Court of Chancery for an order to compel the corporation to permit such examination. The burden of proof shall be on the corporation to establish that the examination such stockholder seeks is for a purpose not germane to the meeting. The Court may summarily order the corporation to permit examination of the list upon such conditions as the Court may deem appropriate, and may make such additional orders as may be appropriate, including, without limitation, postponing the meeting or voiding the results of the meeting.[141]

Phixios did not provide the stockholder lists because of its belief that Henry was attempting to harass and compete with the Company. I find these reasons insufficient to justify the denial of Henry's inspection request. Phixios also argues

---

[140] 8 *Del. C.* § 219(a).

[141] *Id.* § 219(b).

41

that this Court should not exercise its discretion to void the results of that meeting because Henry could have, but did not, petition this Court to obtain the list before the meeting. Henry's initial Section 219 request was sent on June 21, 2016; his Demand Letter was delivered on June 23, 2016; and yet he did not become a plaintiff in this action until July 22, 2016, nearly a month later and well after the June 30, 2016 meeting came and went. Henry did not respond to Phixios's argument in his post-trial briefing or at oral argument. Therefore, I decline to exercise the discretion granted under the statute to void the results of the June 30, 2016 stockholder meeting.

## IV. ANALYSIS OF THE FEES REQUEST

Henry seeks the award of costs and attorneys' fees for this litigation. As an initial matter, Henry did not brief his fees request in his opening post-trial brief.[142] Additionally, "[a]lthough . . . fee-shifting awards may be merited in exceptional cases in order to deter abusive litigation, avoid harassment, and protect the integrity of the judicial process,"[143] in order to warrant the Court's departure from the

---

[142] *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001) ("In its opening post-trial brief, Tyson did not argue that these issues would in themselves be sufficient to give it a reason not to close in the event that the DFG-related issues in the Restated Financials were carved out by Schedule 5.11. As a result, I consider Tyson to have waived any arguments about these issues."); *Emerald P'rs v. Berlin*, 726 A.2d 1215 (Del. 1999) ("Issues not briefed are deemed waived.").

[143] *Fairthorne Maint. Corp. v. Ramunno*, 2007 WL 2214318, at *9 (Del. Ch. July 20, 2007).

American Rule requiring each party to bear their own costs and fees regardless of the outcome of the case, the plaintiff must show that defendants "'unnecessarily required the institution of litigation, delayed the litigation, and asserted frivolous motions,' or, put another way, [that] defendants' bad faith has 'made the procession of the case unduly complicated and expensive.'"[144]  Although I have ruled against Phixios, Henry has not convinced me that Phixios engaged in bad faith litigation conduct that would justify a fee award to Henry.

## V.    CONCLUSION

For the foregoing reasons, I find that Henry is not subject to the stock transfer restrictions contained in the Stockholder Agreement and, therefore, is a stockholder of Phixios.  Henry is entitled to inspect the books and records he seeks in this litigation.  While Henry was entitled to inspect the stock ledger of the Company before the June 30, 2016 stockholder meeting, and the Company withheld this list without justification, Henry has not provided any substantive response to the Company's argument that this Court should not exercise its discretion to void the results of the June 30, 2016 meeting.  Thus, I deny Henry's request to void the results

---

[144]    *Id.* (quoting *Johnston v. Arbitrium (Cayman Islands) Handels*, 720 A.2d 542, 545-46 (Del. 1998); *ATR-Kim Eng Fin. Corp. v. Araneta*, 2006 WL 3783520, at *23 (Del. Ch. 2006), *aff'd* 2007 WL 1704647 (Del. 2007)).

of the meeting.  Henry also is not entitled to fee shifting.  The parties shall submit an order consistent with this opinion within ten (10) days.

**IT IS SO ORDERED**.